[Wood, *appellant*, and Young and wife, *respondents*.

Where there is a covenant by one party to another to pay the one half of
what shall be *recovered in a suit* against an insurance company on a policy
on a *cargo* of a vessel which has been *captured*, and the indemnity is *re-
ceived under a treaty* with the government of the *captors*, a court of equity
will enforce the agreement and compel the payment of the one half of the
sum received.

The court for the correction of errors refused in this case to listen to the sug-
gestion that part of the indemnity received was *for freight* or *loss of profits*
in lieu of freight: the point not having been raised or urged in the court
below.

An instrument containing *mutual releases* and a covenant by one party to the
other to pay the half of what might be recovered in a suit then pending,
brought by the covenantor against a third party, will not be *set aside* on
the allegation that the accounts between the parties were at the time open
and unsettled, and that it had been since discovered that a large balance
was due to the party covenanting; releases executed to avoid the neces-
sity of investigating old accounts, and where the right is doubtful, will not
be disturbed unless *fraud* or *palpable and gross mistake* is shown.

Nor will the accounts between the parties be overhauled for the purpose of
shewing that the covenant was *without consideration*, and therefore void ;
it will be considered all as one transaction, founded on one and the same
consideration—a general and final adjustment of all claims and controver-
sies between the parties.

APPEAL from chancery.  William Wood, the appellant,
and John B. Lasher, the former husband of Mrs. Young,
were interested in three commercial adventures to the Med-

ALBANY,
Dec. 1830.

Wood
v.
Young.

iterranean, carried on in the years 1806–7, in the brig *Sea-man*, commanded by Lasher, as master. In the last of the voyages performed the vessel was captured by armed boats under the *Spanish* flag, and carried into *Algesiras*, where the vessel and cargo were lost, the vessel being driven on shore in a gale. The cargo was insured to the amount of $14,000 in the name of Wood alone, by the Commercial Insurance Company of New-York; after the loss, Wood abandoned to the underwriters, who paid him $4000 on account, and gave up his note for the premium, amounting to $1262,25, but subsequently refused to pay any more; whereupon Wood commenced a suit against the company for the recovery of the balance. On the 21st December, 1812, he wrote Lasher on the subject of the suit, recognizing him as jointly interested with him in its event; saying, among other things, " I would sacrifice my half to obtain the balance for you;" and then, after alluding to the precarious state of the health of Lasher, proposes an arrangement which he hopes will satisfy him and his family after him, should his disease under which he was then laboring prove fatal; he proposed that in the event of a recovery, Lasher's family should have his (Wood's) obligation to receive *half the amount of the suit and damages* immediately on the receipt of the money; and that Lasher should send him a counter obligation that all the difference between them laid in the suit at law; that the one half was his if recovered, and if lost, that he was bound for half the amount of costs. Shortly after the date of this letter Lasher died, leaving among his papers *invoices* of the goods shipped in the *Seaman* in the three voyages, stated to be shipped by Wood on the proper account and risk of the shipper and master, *each half*; an *account* of the third voyage, charging a loss upon the cargo of $13,720, and an *account current* between Lasher and Wood in reference to the adventures, exhibiting a balance in favor of Lasher of $2663,99, besides the half proceeds of certain merchandize not sold—these papers being in the hand writing of a clerk of Wood. On the 23d July, 1814, an instrument in writing under hand and seal was executed by Wood of the one part, and Mrs. Young (then Mrs. Lasher,) as executrix of the last will and testa-

ment of John B. Lasher of the other part, whereby Wood releases Mrs. Lasher, executrix as aforesaid, from all suits, actions and causes of action, from the beginning of the world to the day of the date of the instrument, and covenants to pay to her the one equal moiety or half part of all monies thereafter (to be) recovered or received from the Commercial Insurance Company of New-York, on a policy of insurance, for the recovery of which a suit was then pending in the supreme court of judicature of New-York, first paying *out of such recovery or receipt* all necessary counsel fees and costs and charges attending the same ; and Mrs. Lasher, on her part, as executrix as aforesaid, released Wood and all persons concerned with him from all claims on account of John B. Lasher, save the avails of money to be recovered as above mentioned from the Commercial Insurance Company ; it being declared that the instrument should be considered to operate as mutual absolute releases one from the other, saving and excepting the claim from the insurance company for and in favor of Mrs. Lasher. Nothing more was recovered from the insurance company ; but under the *Spanish* treaty of 1819, making provisions for spoliations upon our trade, Wood, by a decision of the commissioners under that treaty, had awarded to him and received $8214,09, by reason of the capture of the brig *Seaman.* In his memorial to the commissioners, Wood claimed $25,892,29, consisting of the following items, viz: Amount of invoice, $17,839,-79 ; cost of vessel and outfits, $7500 ; insurance $1622,50 ; *probable profits in lieu of freight,* $4500 ; *total,* $31,462,25 ; from which he deducted as received from the insurance company, $5570, leaving a *balance* of $25,892,29.

In January, 1825, Mrs. Lasher, as executrix of the will of her late husband, filed her bill in the court of chancery against Wood, stating the above facts, averring that she was beguiled into the execution of the release of July, 1814, but that she was advised that it would be difficult, if not impracticable, to set the same aside, and therefore insisted that she became legally and equitably interested in the one equal half part of *the subject matter in controversy in the suit* against the insurance company, and that the abandonment of the suit by

Wood, and his resorting to another tribunal for, and there obtaining compensation and indemnity for the same subject matter, did not affect her rights or impair the liability of Wood; and she therefore prayed that Wood might be directed to account with her in the premises, upon such principles and basis as the court might, under all the circumstances of the case, deem most just and equitable, and to pay such sum as might be found due. The defendant put in his answer, in which he substantially admitted the facts alleged in the bill, but insisted that although at a certain time a balance appeared on his books in favor of Lasher, as stated in the bill of complaint, and that Lasher must have obtained a transcript of the same, still, that the transactions of the voyages and the accounts between the parties were not then closed, but that the same was an *open account;* and that after the date of the account, as stated in the bill, he paid Lasher several considerable sums of money, and Lasher became chargeable and was charged with other large sums of money, which turned the balance in favor of the defendant; that after the Spanish treaty in 1819, and whilst the claims for indemnity were pending before the commissioners, he caused an account current to be made out between him and the complainant's testator, which he believes to be correct, and which exhibits a balance in favor of him, the defendant, of upwards of $4000. The defendant also, in his answer, denied that the complainant was legally or equitably entitled to any part of the sum awarded under the Spanish treaty, inasmuch as the stipulation in the release was a mere *gratuity* to the complainant, and was made at a time when he, the defendant did not know the exact state of the accounts between him and Lasher, nor how large a sum was due to him, the defendant, from Lasher's estate, and insisting therefore that the complainant ought to be held strictly to the *terms* of the stipulation. He admitted that the sum received by him under the Spanish treaty, after deducting counsel fees and expenses, was $6369,62, but denided his responsibility for any part thereof to the complainant.

The cause was heard by Chancellor *Jones,* who, in April, 1827, ordered a reference to a master to take and state an

account between the parties, including the monies received by the defendant under the Spanish treaty ; and that in taking and stating such account, the master credit the complainant with the *one half* of the net amount of the said money so received by the defendant, as so much money received for her use, with the interest thereof from the time when the same was received ; and that he make to the defendant *all just allowances,* all other questions being reserved.  Shortly thereafter the suit abated by the intermarriage of the respondents ; but it was revived by consent, and a hearing was had before the master.   The defendant produced before the master his books, vouchers and receipts, and offered to prove that the account current between him and Lasher, mentioned in the complainant's bill, was an open and unfinished account ; and that, on closing the transactions to which it relates, the result is a balance in favor of the defendant of $4,590,52.   The master refused to hear the proof, and reported that he had credited the complainant with the one half of the net amount of the monies received by the defendant under the Spanish treaty, with interest thereon ; that he had made all just allowances to the defendant, and that there was due to the complainant the sum of $3566,55 ; and that he had overruled the evidence offered by the defendant.   To this report the defendant excepted, for the reason that the proof offered by him was not received.   The exceptions were overruled by Chancellor Jones ; and on the cause coming up on the equity reserved, his successor, Chancellor Walworth, in May, 1828, decreed that the defendant pay to the complainants the sum reported due, with the interest thereof, together with the costs of suit.   From this decree the defendant appealed.

*S. A. Foot & S. A. Talcott,* for appellant.   The agreement of July, 1814, ought not to be enforced, because not according to the equity of the case ; at law the complainants could not have recovered, the event not having happened upon which depended their right to demand payment, to wit, *a recovery against the insurance company ;* being obliged to ask equity, they must do equity.   A defendant to a bill

for a specific performance of an agreement, is allowed to resist it by shewing that under the circumstances the plaintiff is not entitled to the prayer of his bill. A defendant is allowed, by parol evidence, to shew circumstances *dehors*, independent of the writing relied on by the plaintiff, making it inequitable for a court of chancery to interpose by granting the relief prayed for. Here it was averred by the defendant that the stipulation in favor of the complainant was a mere *gratuity*—a *voluntary agreement*, which was offered to be established by proof before the master. A court of chancery never decrees specifically without a consideration, nor enforces a voluntary covenant, though under seal. *Maddock's Chancery*, 321 to 328. 1 *Johns. Ch. R.* 336. 4 *id.* 500. 2 *Kent's Comm.* 324, 354. Besides, both parties complain that the agreement was executed under a *misapprehension* of their rights; why, then, should it be carried into effect? The bill prays for *an account*, and the decree of April, 1827, directs an account. The master was instructed not only to credit the complainant with the one half of the *net* amount of the monies received, but also to make to the defendant all just allowances; clearly shewing that the chancellor contemplated that a full account was to be taken, which is further manifest by the reservation of all other questions. His subsequent decree, overruling the exceptions to the master's report, bears a different complexion; and because it does, it is deemed to be erroneous. The decree at all events is wrong, because part of the claim presented by the defendant to the commissioners under the Spanish treaty, and allowed by them, was for probable profits in lieu of *freight*. Lasher had no claim for freight, and it was not demanded in the bill. All that was demanded was a moiety of what might have been recovered of the insurance company under the policy on the *cargo*. It cannot be objected that this point was not raised in the court below; it could not be agitated there, as the first decree was supposed to be unexceptionable. Nor can it be said that the defendant lost his exclusive right to it by mixing it up with other claims. It was not his fault that an award in gross was made to him.

*G. Griffin*, for the respondents. The executrix of Lasher would have been entitled under the agreement to have received the one half of the sum insured on the *cargo* of the brig, had it been recovered of the insurance company ; the fact that the indemnification for the capture and subsequent loss of the cargo was received by the appellant from the captors through the government, cannot affect her right. The insurers were entitled to credit on the policy for the money so received, and a recovery· could have been had against them only for the balance. 1 *Vesey, sen.* 98. 1 *Eden,* 130. 9 *East,* 72. 8 *Johns. R.* 246. The award in favor of the appellant enured to the benefit of the estate of Lasher. 1 *Paige,* 139. 1 *Peters,* 139.

The instrument of July, 1814, closed all accounts between the appellant and the estate of Lasher. *Fraud* is not alleged ; nor is there any *mistake* in the legal acceptation of the term, admitting there were in fact charges which existed against the estate of Lasher, but which were not at the time of the agreement adverted to. Where the state of accounts between parties is uncertain, and mutual releases are executed, they will not be set aside, although it should subsequently appear that the balance was different from what was contemplated at the time of the arrangement ; one release is a good and sufficient consideration for the other. 1 *P. Wms.* 726. *Powell on Cont.* 142. To set aside a release on this ground, such a mistake must be shewn as ordinary diligence and prudence could not have guarded against ; a mistake was never pretended in this case, and for eleven years the release was unquestioned. A release grows better for age. Again ; the defendant rendered an·account in 1808, shewing a balance in favor of Lasher ; in 1812 he acknowledged Lasher's claim to one half of the avails of the suit. Here, then, was an account rendered and not questioned for 17 years, which alone would have precluded an inquiry into previous accounts. After two years, a party *receiving* an account and not dissenting to it, is precluded. 3 *Johns. R.* 569. Much more ought a party *rendering* the account to be estopped.

If the freight belonged exclusively to the appellant, he forfeited it, by intermixing his claim for it with the claims in

which the estate of Lasher was interested with him, or at least, he assumed on himself the burden of discriminating his own from that which was joint property, 2 *Kent's Comm.* 297; and this should have been done before the master, who was authorized to make all just allowances. In the court below this defence was not intimated; the defendant ought to have excepted to the report on this ground, or ought to have asked for a re-hearing; not having done so, and it not appearing that the question was raised in the court below, it is not competent now to insist upon this point. 4 *Wendell,* 180. 2 *id.* 137. 2 *Cowen,* 31. Besides, *non constat* but the whole sum allowed to the appellant, under the Spanish treaty, was for the loss on the *cargo.*

The following opinion was delivered:

By Mr. Justice SUTHERLAND. The first and most material inquiry in this case is, as to the nature and effect of the instrument mutually executed by the appellant and Mrs. Lasher, as executrix of her husband, on the 23d day of July, 1814. It was in the form of articles of agreement between Sarah Lasher, executrix, &c. of John B. Lasher, deceased, and the appellant, William Wood. It purports to be a final and absolute *settlement* and *release* of all accounts, claims or demands whatever, existing at or prior to that time between Wood and the estate of Lasher, with the single exception of the claim involved in the suit which had been commenced by Wood against the Commercial Insurance Company, and a covenant on the part of Wood, in relation to that claim, that he would pay over to Mrs. Lasher one half of whatever should be recovered deducting costs and charges. On what ground, then, is it that the appellant seeks to avoid the effect of these solemn releases, and to go into a general examination and statement of the previous accounts and transactions between him and the respondent's testator? He contends, 1. That it appears from the bill and answer that the agreement was executed under a *misapprehension* by both parties, and that they both complain that it does not settle the differences between them, according to their respective rights; and that such an agreement ought not to be enforced, nor

preclude an investigation of all the accounts and transactions between the parties; and 2. That at all events, such an investigation should have been permitted for the purpose of showing (as he contends it would have shown) that there was a large balance at that time due from the testator's estate to him, and that the covenant or agreement on his part to pay the executrix one half of what might be recovered from the Commercial Insurance Company was consequently a *voluntary* and *gratuitous* promise; that the respondent therefore ought to be held strictly to the *terms* of the agreement, and was not entitled, upon any equitable construction of it, to any money which the appellant might have received from any other source than the insurance company, although it might have resulted from the same original transaction. These are the prominent grounds on which this part of the case was put by the counsel for the appellant.

I will first look at this case in reference to the pleadings. The bill is not framed with a view to set aside the releases, either on the ground of fraud or mistake. It does not ask to have them set aside, but on the contrary states that the complainant is advised that it would be difficult, if not impracticable, successfully to impeach them on either of those grounds; and the prayer of the bill is confined to the relief to which the complainant may be entitled under the covenant of the appellant, thereby expressly affirming the binding force and obligation of the whole instrument. It is true there are allegations in the bill, that when the proposition for this general settlement was originally made by Wood to Lasher in December, 1812, there was a large balance due to Lasher, and that the proposition was *insidiously* made by Wood for the purpose of extinguishing that balance; and that after the death of Lasher, Wood renewed the same proposition to the complainant, and that she being unacquainted with business, and ignorant of the dealings and accounts between Wood and her testator, under the advice of her friends, finally acceded to it and executed the release; and she charges that she was *beguiled* into the execution thereof, under the representation and impression that one half of the cargo of the last voyage in which Wood and her husband

were concerned, did in fact belong to her husband, and in ignorance of the important influence which that fact, when once established, must have on the result of the suit instituted by the appellant against the Commercial Insurance Company. In answer to these charges, the defendant says he was induced to make the application to Lasher, to come to some settlement and adjustment of their accounts, by the knowledge of the precarious state of his health at that time, and from a desire to have every thing between them settled, befor his, Lasher's, then expected death; and that he proposed those terms without a knowledge of the exact state of their accounts, as it appears from his books that Lasher was at that time considerably indebted to him; and he denies that he ever made any proposition for a settlement to the complainant after the death of her husband, but that on the contrary, the application was made by the complainant or some one on her behalf to him; that such application was repeatedly made, and mutual releases proposed; and that believing their accounts were nearly balanced, he finally consented to such release, and suggested the stipulation in relation to the proceeds of the suit against the insurance company, and denies that the proposition to Lasher was *insidiously* made, or that the complainant was *beguiled* by him into the execution of the releases by any representation made by him as to the interest of Lasher in the cargo. There is no evidence in the case which impeaches the answer upon the point of fraud or misrepresentation. Indeed there is no foundation for imputing either to any of the parties concerned in the arrangement. I am persuaded that it was not only entirely fair, but highly judicious, under all the circumstances of the case.

The first proposition for a settlement was made by the appellant to Capt. Lasher, in a letter written to him on the 21st December, 1812. This letter is an important document in several points of view. It shows in the first place, that the appellant then admitted the interest of Capt. Lasher in the suit which had previously been commenced and was then pending against the insurance company; and that he was entitled to one half of whatever might be recovered,

It appears to have been written in answer to a letter of the 11th of the same month from Capt. Lasher, in which it seems he had complained of the delay which had attended the prosecution of the suit. The appellant first vindicates himself from all blame in relation to it, and expresses his strong indignation against the company, and his willingness to sacrifice his *half*, to obtain the balance for Capt. Lasher. He then states that the expenses of the suit, if they should fail, would be heavy, and therefore suggests the propriety of employing additional counsel, and then says, "Should it unfortunately happen that *we* should be defeated and fail to recover, it will be necessary for us both, considering your precarious state of health and my situation, to come to some immediate arrangement, in order that persons unacquainted with our business and the attending circumstances, who may hereafter have the disposal of them, may be able to settle them without difficulty or error. I therefore now state to you my ideas on the subject for your opinion and concurrence, which will probably satisfy you now and your family hereafter should any thing happen to you. My opinion is, that in the event of recovery, your family should have my obligation to receive half the amount of suit and damages immediately on the receipt of the money, &c. This will put it out of the power of any controversy should you not be present. On the other hand, that you send me a counter obligation, that all the difference between us lies in the suit at law, that the one half is yours if recovered, and stating that if lost, you are bound for half the amount of costs. On this subject you may reflect, and if you think any other mode more eligible, please to suggest it; for it will be my greatest ambition, that you and your family shall be satisfied with my conduct, and my greatest pleasure will be, if recovered, to pay you or them the half." The reasons for the appellant's solicitude for a final settlement between him and Capt. Lasher are disclosed on the face of this letter. He had failed or was embarrassed, and Capt. Lasher was not expected to live long. He in fact died soon after. The settlement of their affairs, therefore, would soon devolve upon others, who would be ignorant of all the circumstances connected with

them, and would be likely to fall into errors; and, at all events, would be less capable of amicably adjusting them upon proper principles. It appears that the appellant and Capt. Lasher had been jointly concerned in several commercial adventures of considerable importance and extent, and that their accounts had never been fully and finally settled. The solicitude of the appellant upon this subject was therefore not only natural but praiseworthy; and the fact that the proposition for a settlement was originally made to Capt. Lasher upon substantially the same terms as were finally agreed upon between the appellant and his testatrix, would tend strongly to shew that he had no design to take advantage of her general ignorance of business, or her ignorance of those particular transactions. But this point is placed beyond all doubt by the fact that Mrs. Lasher herself renewed the proposition for a settlement, and that it was upon her application that the releases were finally given; this is positively alleged in the answer, and is entirely uncontradicted.

Nor was there any *mistake* in the settlement which can afford any ground for setting it aside. The only pretence of mistake, consists in the assumption that the releases were executed, because both parties supposed that their accounts were exactly balanced; whereas each now swears, that upon further investigation, he finds that his adversary was at that time largely indebted to him. So far from this assumption being well founded, the very fact of exchanging formal releases, shews that the parties supposed that there might be a balance due, but that it was doubtful in whose favor it would be. The very object of the releases was to avoid the necessity of investigating their old accounts for the purpose of ascertaining the precise balance, which in all such cases is conceded to be uncertain and doubtful. The one release is the consideration for the other, and they ought never to be disturbed unless there has been fraud, or palpable and gross mistake. The principle laid down by Lord Macclesfield in *Cann* v. *Cann*, 1 *P. Wms.* 726, is applicable to this case. He said that where two parties were contending about an estate, and one released his pretensions to the other, there could be no color to set this release aside, because the party

that made it, as it turned out, had the right. If so, there could be no compromise of a suit, or any accommodation of a controversy. Every release supposed the party making it to have a right; but this could be no reason for setting it aside, for then every release might be avoided. The right must always be on one side or the other, and therefore the compromise of a doubtful right was a sufficient foundation of an agreement. That the right in this case was and is doubtful, is shewn by the conflicting allegations of the parties; and after so long an acquiescence, it would require a very strong case to justify a court in disturbing such a settlement, even where its interference for that purpose was directly invoked.

If the accounts prior to the releases cannot be overhauled for the purpose of charging either party with a balance, it seems to me necessarily to follow that they cannot be gone into in order to show that a part of the same agreement in relation to the same subject matter was without consideration and therefore void. The argument is shortly this: the covenant of Wood to pay Mrs. Lasher one half of the sum which he might recover from the insurance company was without consideration, unless he was at that time indebted to the estate of Captain Lasher. When Mrs. Lasher, therefore, comes into a court of equity to enforce that covenant, he ought to be permitted to show that he was not indebted to the estate, and that the covenant was therefore void; and that, he can do only by overhauling all their antecedent accounts. This view of the case is susceptible of several answers. In the first place, it is a mere assumption that this was a voluntary or gratuitous promise on the part of the appellant, in any sense, that is not equally applicable to the whole arrangement. The parties agreed to settle all matters in difference between them, and to exchange releases, embracing every thing except the matter involved in the suit against the Commercial Insurance Company; that was excepted in terms in the releases of the respondent, and the appellant expressly covenanted to pay to her one half of whatever should be recovered. Upon the face of the instrument there certainly is nothing to show that the demand

against the insurance company belonged exclusively to the appellant. The form of the transaction with the company had been such as to make it necessary or proper to bring the suit in his name; but the legal and natural inference from the instrument itself would be, that it was a debt due to them both beneficially; and that the amount which would be realized being uncertain, and the parties being desirous to make a final and complete settlement of the partnership transactions, the appellant covenanted to pay the respondent one half of whatever should be realized from the suit, for the express purpose of giving the respondent a legal remedy, and avoiding the necessity of any subsequent examination of the partnership accounts. All that the appellant says upon this subject in his answer is, that he himself suggested this part of the agreement, and that it was not exacted or required by the agent of the respondent; and although he admits that the complainant, by virtue of the exception in the release, was *legally* and *equitably* interested in the one equal half part of whatever might *have been recovered in the suit*, yet he denies that she is legally and equitably entitled to any part of the sum awarded by the commissioners, *inasmuch as the stipulation in the release was a mere gratuity* on the part of the appellant to the complainant, and the complainant ought therefore to be held strictly to the *terms* of the stipulation. This is not a positive averment that it was a *gratuity*, but an inference from the fact that the covenant was originally inserted at his suggestion, and that all the complainant's rights and equities in relation to this fund sprung from that suggestion, and had no previous existence. This part of the answer appears to me to be completely disposed of by the appellant's letter to Capt. Lasher of the 21st December, 1812, between one and two years prior to the date of the agreement with the complainant. I have already adverted to the fact that in that letter the appellant speaks of the suit against the Commercial Insurance Company as one in which he and Captain Lasher were equally interested, and consults him as a party in interest in relation to the costs and employing additional counsel.

He says, "Should it unfortunately happen that *we* should be defeated, or the suit should go against *us*, it will be necessary," &c. and then proposes a settlement upon precisely the same terms as were finally adopted by him and the respondent, with the single exception of a stipulation in relation to the costs. This letter was undoubtedly the basis of the final agreement; and it shews conclusively, that if the appellant did suggest that provision in the contract, it was not for the purpose of conferring a bounty upon the complainant, but to give her a legal right to that which he had long before acknowledged her husband was equitably entitled to, and which he had offered to secure to him in the same manner.

But admitting that the estate of Capt. Lasher had no interest in that fund previously to the settlement in 1814, the result, in my opinion, would still be the same. The agreement is to be taken altogether, and the release and stipulation or covenant, on the part of the appellant, is to be considered *the consideration* for the release of the complainant. I do not perceive upon what principle that part of the contract is to be separated from the rest, and to be treated as a distinct and independent covenant, requiring to be supported by a distinct and independent consideration. The appellant was willing to give that covenant and a release for a general release from the complainant. It was all one transaction, founded upon one and the same consideration—a general and final adjustment of all claims and controversies between the parties. The appellant was therefore properly precluded from going into an investigation of the antecedent accounts for the purpose of shewing that there was no consideration for this part of his agreement.

But it was said that by the terms of the decree of the 23d April, 1827, all the acts between the parties were opened, and a general account was directed to be taken. The language of the decree is not free from ambiguity; but it will admit of the restricted construction which Chancellor *Jones* subsequently put upon it, when the point was distinctly presented to him, upon the exceptions to the master's report. His construction of his own decree ought, under such circumstances, to be deemed conclusive.

The covenant or agreement of the appellant being established as having been given upon a valid and sufficient consideration, its construction can admit of no serious doubt. The object of the agreement was to secure to the respondent one half of the indemnity which might be recovered or received by the appellant for the capture and subsequent loss of the cargo, which had been insured by the Commercial Insurance Company; and although the indemnity was then expected to be received through the suit against the insurance company only, yet a court of equity will look at the substance of the transaction, and presuming the parties to have dealt fairly and honestly with each other, will enforce the agreement according to its spirit and substance. Upon this principle there can be no question that the respondent was entitled to participate in whatever might be recovered or received by the appellant on this account, whether received from the insurers, the captors, or our own government. It is correctly said, in one of the respondent's points, that the insurance company were entitled to credit on their policy for the amount so received by the appellant from the captors, and a recovery could be had against the insurers only for the balance; and that the receiving the money from the captors was therefore attended with the same legal effects and consequences as though it had been received directly of the insurers. The point appears to me too clear to require or even to be susceptible of illustration.

The only remaining question is whether the decree should be modified or reversed so far as it gives to the respondent any part of the money received by the appellant, under the award of the commissioners, for freight or loss of profits in lieu of *freight.* What amount was awarded for freight does not appear. All that does appear in the case upon that subject is contained in the bill. It is there stated that the appellant, in the memorial presented by him to the commissioners, claimed $4500 as probable profits in lieu of freight; and that the commissioners, in their award, allowed the claims of the appellant and the insurance company as valid for the value of the vessel, for the freight, and for the value of the car-

go; and liquidated the aggregate amount to be allowed, at $21,961,84, to be divided as follows: To the insurers $13,-747,75, and to the appellant $8214,09. Whether the freight allowed was given to the appellant or to the insurers is not distinctly stated, although it is probable it was given to the appellant; but how much was allowed on that account, the case affords no means of determining. The answer simply admits the allegations of the bill upon this point to be correct, and that the *net* amount received by the appellant under the award was $6369,62. There was no suggestion in the answer, nor upon any of the hearings before the chancellor or the master, (so far as the case discloses,) that any particular portion of this fund was exempt from the complainant's claim on the ground that it was given for the loss of freight, and not the loss of the cargo; and it is therefore objected preliminarily, by the respondent, that the appellant cannot now, for the first time, raise that question in this court. I am inclined to think the objection is well taken. The first decree of Chancellor *Jones*, ordering a reference to a master to state an account between the parties, directed the master, in taking and stating the account, to credit the complainant and debit the defendant with the one half of the *net* amount of the said monies so received under the said award, as so much money received by him for the use of the complainant; and that in stating the account, he should make to the defendant *all just allowances*. If under this decree the master had no authority to go into the items composing the sum awarded to the defendant, and to exclude from the account all that had been allowed for freight, then it was a positive decree in favor of the complainant for one half of the net sum received by the defendant under the award, whether for freight or cargo; and the defendant should have taken the necessary measures to correct the decree in that respect, if he deemed it erroneous, before he entered upon the hearing before the master. If the master had the authority to discriminate under the decree, then the defendant was bound to have raised the question before the master, and to have excepted to the master's decision if erroneous. He did nei-

ther; nor did he make a suggestion upon the point, on the final hearing upon the equity reserved. The point is first raised upon the argument in this court. The attention of the court below has certainly never been directed to this question, nor can it be said ever to have been passed upon by, or distinctly presented to it; and it is the established general practice of this court not to reverse a judgment of the supreme court, or a decree of the court of chancery, upon a point not raised or urged in those courts. This practice is founded not only upon the nature of the jurisdiction of this court, which is exclusively appellate, but upon other considerations also of great importance to the due administration of justice, and which are recognized to a greater or less extent in the practice of all courts. Parties must be held to the exercise of diligence in the assertion of their rights; they must assert them at the proper time, or they will be deemed to have waived them. Suits would have no end, if this principle were not adhered to; but it is applied with peculiar rigor in this court, for reasons which have been frequently stated in the cases in which the question has arisen : 12 *Johns. R.* 493 ; 13 *id.* 361 ; 17 *id.* 469 ; 2 *Cowen,* 31 ; 2 *Wendell,* 146 ; 4 *id.* 179.

I am of opinion, therefore, that the decree of the chancellor ought to be affirmed throughout.

This being the unanimous opinion of the court, the decree of the chancellor was thereupon affirmed, with costs.