No. 10.—Thomas B. Wyche and Wife, plaintiffs in error, *vs.* Thomas B. Greene, defendant in error.

[1.] The interposition of a Court of Equity to correct mistakes, both as to law and fact, by ordering a proper deed to be executed, according to the true intent of the parties, is a very ancient doctrine.

[2.] Case of *Lansdowne vs. Lansdowne* approved.

[3.] It has always been a familiar branch of Equity jurisdiction, to grant relief to parties, against agreements made under a misconception of their rights.

[4.] In every case under this head of the law, the only inquiry is, does the instrument contain what the parties intended it should and understood that it did? Is it their agreement? If not, then it may be reformed by *aliunde* proof, so as to make it the evidence of what was the true bargain between the parties. And it is wholly immaterial from what cause the defective execution of the intent of the parties originated.

[5.] Questions on demurrer, amendments to pleadings, &c. are constantly brought up for review before this Court, which have not been distinctly presented to and actually passed upon by the Superior Court. This is a growing evil, and one which ought to be corrected.

[6.] A Court of Equity will not aid one volunteer against another: neither will it enforce a voluntary contract.

[7.] If a voluntary contract, however, be actually executed, then a Court of Equity will enforce all the rights growing out of the contract, against any body.

[8.] If the most unequivocal testimony is required, before Courts of Equity will grant relief against written contracts, the antiquity of the transaction, as well as the fact that the donor, himself, was the draftsman of the instrument, increases the difficulty as to the satisfactoriness and sufficiency of the proof.

In Equity, in Upson Superior Court. Decision on demurrer, by Judge Starke, May Term, 1854.

This was a bill filed by Thomas F. Wyche and Adeline W. Wyche, his wife, against Thomas C. Greene of Upson county, and Elias McElvin of Decatur county. The bill states, that the complainants were intermarried in 1839; that Adeline W. is the child of Patience C. Greene, the wife of the defendant,

and daughter of Batt Wyche, late of Montgomery county; that the defendant and Patience C. were married in 1814; that Patience died in 1848; that Batt Wyche, in 1817, and for some time previous thereto, entertained the wish and purpose to loan to his daughter, Patience C. for her life-time, four negro slaves, to wit: Sally, Moses, Ellick and Sealy, together with all their increase, previous and subsequent to that time; and at the death of his daughter, to give the said negroes and their increase, in fee-simple, to the children that were and might be born of the said Patience, at her death: the same to be divided, share and share alike among them, immediately upon her demise; that with the design of loaning and giving said negroes and their increase in manner aforesaid, and for the purpose of carrying the same into effect, the said Batt Wyche executed the following deed of gift:

"STATE OF GEORGIA, MONTGOMERY COUNTY:

Know all men by these presents, that I, Batt Wyche, for and in consideration of the love and affection which I have and bear unto my well beloved daughter, Patience Clark Greene, and the issues of her body, do give, grant and relinquish unto the said Patience C. Greene and issue, four negro slaves, to wit: Sally, Moses, Ellick and Sealy, together with all their increase, heretofore and after these presents, the rights thereof whatsoever, unto the said slaves and increase, to have and to hold the said slaves and increase as aforesaid, unto the before-named Patience C. Greene and issues forever, freed and cleared of and from the claim of him, the said subscriber. In witness whereof, the said Batt Wyche has hereunto set his hand and seal, the 15th day of February, 1817.

BATT WYCHE, [L. S.].

In presence of

W. CONNER,

J. G. CONNER, J. I C.

" I make an addition to the within deed, of five hundred dollars, in place of one small negro and other things.

Given under my hand, this 6th day of October, 1817.   To be paid next fall.                    BATT WYCHE."

Test, WILSON CONNER, J. I. C."

"Received, the 12th of April, 1819, four hundred and fifty dollars of the above deed.      THOMAS B. GREENE."

"Received, June 2d, 1821, in full of the above, fifty dollars.
                          THOMAS B. GREENE."

The bill further charges, that on the day when said deed was executed, or about that time, that the said Batt Wyche, for the purposes hereinbefore stated, delivered the deed of gift to Greene, his son-in-law, who received the same, to be held for the use and benefit of his wife and children; and that he did, in point of fact, so hold said deed until the year 1824, when he gave up the same to the administrator of Batt Wyche, to be used as a voucher or for some other purpose, unknown to the complainants; and that said instrument was found, in 1850 or 1851, among the papers of George Wyche, who is now dead, but who was one of the administrators of Batt Wyche; and that McElvin is the administrator of Batt Wyche.   The bill further charges, that the four negroes mentioned in the deed, were delivered by Batt Wyche to Thomas B. Greene.   It further charges, that the draftsman, in drawing said deed of gift, failed to use apt words to carry the design and purpose of Batt Wyche into effect, as clearly set forth; and that the scrivener, in framing the instrument, made a mistake in this : that instead of loaning the negroes and their increase to Patience C. Greene, during her life, and at her death, giving the property in fee-simple to the children, the writer drew the deed so as to convey the negroes to Mrs. Greene, absolutely, and the issue of her body.   The bill avers that this was the result of accident, and that Batt Wyche, at the time of executing and delivering said deed of gift, intended the same to be a conveyance by deed of gift, that loaned the four slaves and increase to Mrs. Greene for her life only, and at her death, gave the same to her children, to be equally divided between them, share and share alike.

The bill further charges, that Thomas B. Greene, when the

deed was executed, and when he took the same, had notice that the deed of gift was intended, by Batt Wyche, to convey the negroes as before stated; and that Batt Wyche, during his life-time, understood and believed that the deed of gift was drawn, in conformity with the purpose which he had in view in executing it; and that Greene received the deed, with notice of this fact, and so held the same, with the negroes, for the benefit of his wife and children, as before charged.

The bill further stated, that the increase of Sally and Sealy, amounted to twenty-nine in number, giving their names and description—all of which, together with Ellick, were in the possession of defendant, in March, 1850; that he had given Moses to one Eliazur Adams, one of the descendants of his wife; that the complainants instituted their action of trover, returnable to the April Term, 1850, of Upson Superior Court, for the recovery of the said thirty-one slaves, against the said Greene—upon which, a trial was had in October thereafter, when the Circuit Judge refused to allow the complainants to show the alleged mistake, and decided that the deed of gift vested an absolute title to the negroes, in Thomas B. Greene; and that in consequence of said decision, a verdict and judgment were rendered in favor of the defendant in the action. The bill charges that an appeal has been entered, and that the same is now pending, and which will stand for trial at the ensuing term of the Superior Court, unless restrained, and that complainants will be again compelled to submit to a defeat, unless they can have the deed of gift reformed, so as to represent and carry out the design of Batt Wyche in making the same, at the time it was executed and delivered. The complainants pray for an injunction, and that the mistake may be corrected and the writing reformed.

On the 18th September, 1851, the bill was presented by the complainants to Judge STARKE, in vacation, at Chambers, for his sanction, who refused to grant the same. This decision of Judge STARKE was, upon writ of error, reversed by the Supreme Court at Macon, February Term, 1852.

On the 31st day of August, 1852, Greene answered the bill, and McElvin filed his answer in March, 1853.

On the 6th day of May, 1854, complainants filed an amendment to their bill, alleging the execution of an addition of five hundred dollars to the said deed of gift, by Batt Wyche, and which was endorsed upon said deed; that the same had been paid to Greene, for the use and benefit of his wife and children, as charged in the bill; that they were entitled to receive the same, with interest thereon, from the death of Patience C."

At the May Term, 1854, of said Superior Court of Upson, complainants further amended their bill, in which amendment they charge that B. Wyche, himself, drew the deed of gift; that he was not skilled in drawing such instruments, and that it was his intention so to have drawn the same, as to have conveyed an estate for life, in said negroes, to his daughter, Patience C., and at her death, in fee-simple to her children; and that by a mistake of the said Batt Wyche, in the use of words not proper and technical for the conveyance of such meaning, the said intentions of said Batt Wyche, failed to be equally expressed therein.

After the filing of the amendments, the defendant, Thomas B. Greene, demurred to said amendments, and to the whole bill as amended, upon the grounds—

1st. Because the bill, as amended, is multifarious.

2d. Because said bill, as amended, presents a case in which Equity will not interfere to reform the written instrument, under which complainants claim, for the purpose of enabling the complainants to recover thereon.

3d. Because it does not appear, by the bill or amendments, that Batt Wyche was the owner of the negroes specified in the deed of gift : nor does it appear who was the owner of said negroes, or that the said Thomas Greene was not their owner at and before the execution of the said deed of gift."

After argument of the demurrer, and before the decision of the Court thereon, complainants were allowed to amend their bill further—in which amendment they charged, "that at the time of the execution of said deed of gift, the titles to said ne-

groes was in the said Batt Wyche, and that Greene had notice of the same at the time; that when said Batt Wyche drew and executed said deed of gift, it was his intention so to draft it, that it would convey to said Patience C., an estate for her life in and to the said negroes and increase, and at her death, an estate in fee-simple, to her children; and that Greene then and there well knew that such was the intention of the said Batt Wyche, and that he received said deed with such knowledge as aforesaid."

The Court sustained the demurrer, and dismissed the bill and amendments, and Counsel for complainant excepted.

GIBSON & HILL, for plaintiff in error.

FLOYD & CHAPPELL, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The plaintiff in error filed a bill against Thomas B. Greene and Elias McElvin, as administrator of Batt Wyche, deceased, for the purpose of having a deed of gift reformed, on the ground of mistake in drafting the same.

The bill, as it stood originally, was to the effect, that Thomas B. Greene's deceased wife, Patience C. was the daughter of Batt Wyche of Montgomery county; that Thomas B. Greene intermarried with his wife in 1814, and by her, had a numerous family of children, of whom Adeline, the wife of Thomas T. Wyche, the complainant, was one; that in 1814, Batt Wyche entertained a wish and design to secure to his daughter Patience, for life, and to her children, at her death, four negro slaves: Sally, Moses, Ellick and Sealy, with all their increase; that to accomplish this object, he procured one J. G. Conner or some other draftsman, to draw a deed of gift, a copy of which is annexed to the bill, as part thereof; that said deed of gift was executed by Batt Wyche in 1817, and by him delivered to Thomas B. Greene; and that the said Thomas B. received the same, to be held, together with said negroes and their increase, for the benefit of the said Patience C. and her children;

and that he did so hold and keep said deed of gift, till after Batt Wyche's death.

The bill further states, that the draftsman made a mistake in drawing said deed of gift in this : that said deed conveys the title of said negroes and their increase, to said Patience C. and issue, when, in truth, at the time of preparing, executing and delivering said deed, it was said Batt's instruction and direction to convey said negroes to the said Patience, for her life-time only; and at her death, in fee-simple to her children; and that up to his death, Batt Wyche thought said deed so conveyed said negroes; and that Greene, at the time of receiving, and while he held the same, had notice that such was the nature and design of the conveyance.

The following indorsement was on the back of the deed : "I make an addition to the within deed, of five hundred dollars, in place of a small negro and other things.    Given under my hand, this 6th day of October, 1817, to be paid next fall.

BATT WYCHE."

The deed was duly recorded in the Clerk's office of the Superior Court of Montgomery county, on the 27th day of May, 1817.

Thomas B. Greene kept the deed till 1824, and then delivered it to George Wyche, administrator of Batt Wyche, among whose papers it was found in 1850 or 1851.

The bill prayed that the alleged mistake might be corrected, and the instrument reformed, according to the true intent and meaning of the parties.    It also prayed an injunction, to restrain a trover action then pending between the parties.   Upon being presented to Judge STARKE, he refused to sanction the bill, for various reasons; to which decision and refusal, complainants, by their Counsel, excepted.    And the cause was then brought before this Court, upon writ of error.   After solemn argument, this Court reversed the judgment of the Circuit Judge, holding, that assuming the facts charged in the bill to be true, that the deed of gift from Batt Wyche to Greene and wife, did not contain the actual agreement between the parties; that it was not what they intended it should be, and thought it

was; that the draftsman, by mistake, either as to fact or as to law, drew a different contract from the one contemplated by the donor, and understood and accepted by the donee; and that consequently, Equity ought to interpose and compel the parties to execute their true agreement, and not that which was reduced to writing; that while Chancery had no power to make contracts for parties, or to substitute one for another, it could and would decree, that they should reform those which they had actually made; and if the paper does not fulfil or violates their understanding, it will be rectified and made to conform to it. (11 *Ga. R.* 171.)

The bill having been sanctioned and filed, under the order of this Court, the defendant, Greene, answered the same; and the case standing for trial, the complainants discovered their inability to make out, by proof, such a case of mistake as that set forth in the bill, they obtained leave to amend their bill, so as to make it correspond with the proof. And by the bill, as amended, the averment is not that Batt Wyche procured one J. G. Conner or other person to draw the deed, but that he drew it himself; that he was not skilled in framing such instruments, and that it was his intention so to have drawn the same, as to vest a life-estate in Mrs. Greene, and the fee in remainder, in her children; and that by mistake, in the use of words not proper and technical, the intention of Batt Wyche failed to be legally expressed. And instead of alleging that it was the instructions and directions of Batt Wyche, that the deed should be drawn in a particular way, the bill charges that it was the intention of Batt Wyche, himself, so to have framed it.

To the amended bill Greene demurred, McElvin not having been served with a copy of the amendment; and he insists, that by the amendment, the character of the bill is wholly changed; that, as originally brought, it presented a case of *mistake, in fact,* for which it asked relief; that now, it made a case only of *ignorance or mistake of law,* for which Equity could grant no aid.

The demurrer was sustained by Judge STARKE and the bill

dismissed.   The complainants, by their Solicitors, excepted ; and thus, the case comes again before this Court for revision.

We concur with Counsel for Mr. Greene, that the sole question presented by the record and bill of exceptions is, whether the bill, as amended, presents such a case of mistake and error in the drawing of the deed of gift, from Batt Wyche to his daughter, as to entitle the complainants to a decree in Chancery, against the defendant, Greene, directing said conveyance to be rectified as prayed for by the bill.

If the judgment of the Court upon the case, as originally made, was right, then we are clear that the judgment of the Court below, upon the demurrer filed to the amended bill, was wrong.

It is to be deeply regretted, that there is so much confusion and uncertainty, as it respects this important branch of Equity jurisdiction.   Judge *Story* admits that the English Elementary Writers treat the subject in a very loose and unsatisfactory manner, laying down no distinct rules, when mistakes of the Law are or are not relievable in Equity, but contenting themselves, for the most part, with mere statements of the cases. Whether the same criticism does not apply, to some extent at least, to the learned Commentator himself, as well as to *Maddock, Jeremy, Cooper, Fonblanque, Mitford, Newland,* and those who had preceded him, no one, I think, will doubt, who has read his *5th Chapter, Volume I. Title Mistake.*

All writers on Equity lay down the rule, that mere ignorance of the law, is no sufficient ground for rectifying a contract ; yet, they state so many exceptions, that the rule is utterly smothered and lost sight of.   It is, to my mind, highly desirable that the Courts would hold, if they have the power ; and if not, that the Legislature would enact, with Lord *King,* in *Lansdowne vs. Lansdowne,* (*Mosely,* 364,) that the maxim, ignorance of the law will not excuse, applies only to criminal cases, and not to civil contracts ; or that no mistake of law, whatever, should be corrected.   Like Mr. Calhoun's and **Mr.**

Webster's antipodal interpretations of the Federal Constitution, either would be intelligible, while all between is *terra incognita.*

By way of testing the sufficiency of the present bill, as amended, let us briefly examine some of the doctrines maintained by standard authors and eminent Judges, upon this subject.

[1.] By reference to *Spencer's Equitable Jurisdiction*, (1 *Volume*, 633, *note l*,) it will be found that the interposition of a Court of Chancery, to correct mistakes, both as to law and fact, by ordering a proper deed to be executed, according to the true intent of the parties, was a doctrine of very ancient, as well as familiar occurrence. One of the old Chancellors, *Stillington*, Bishop of Bath and Wells, in the time of *Edward IV.* put it upon what seems to have been a favorite maxim with him, namely: *Deus est procurator fatuorum*—which, as I understand it, means that God is the supervisor or guardian of fools: that is, intervenes to save those from their own errors, who are incapable of taking care of themselves. And therefore, Courts of Conscience, His vice-regents, will perform the same office.

[2.] The case of *Lansdowne vs. Lansdowne*, I know has been often questioned and doubted; and yet, in *McCaithy vs. Decaise*, (2 *Russ. & Mylne*, 614,) Lord *Brougham* held, that where a husband renounced his title to his wife's property, from whom he had been divorced, under a mistake in point of law, that the divorce was valid, and he had no longer any title to her property; and under a mistake of fact as to the amount of the property renounced, the information respecting which the other party knew and withheld from him, he was entitled to relief. Judge *Story* suggests that the relief in this case seems to have been granted upon mixed considerations. But his Lordship, in one part of his opinion, said—"what he (the husband) has done, was in ignorance of law—possibly of fact; but in cases of this kind, *that would be one and the same thing*".

I submit, respectfully, that this opinion indorses, fully, that of Lord *King*, in *Lansdowne vs. Lansdowne*, and which I believe, myself, to have been a most righteous and legal judgment, whether viewed as a case of misrepresentation of a fact,

that the party was not heir, when, in fact, he was heir, or mere ignorance or mistake of the law, as to his true *status*, in relation to the estate of his deceased uncle.

[3.] Indeed, the English Books abound in cases where Equity has granted relief to parties, against bargains and agreements, made under a misconception of their rights. *Bingham vs. Bingham*, (1 *Ves. Sr.* 126.) *Cocking vs. Pratt*, (*Ib.* 400.)

*Hunt vs. The Administrator of Rensmarriere*, is a leading precedent in this country, upon this doctrine; it has never been over-ruled or shaken; indeed, it has been pretty generally followed, by most of the State Courts throughout the Union. It was four times elaborately argued and thoroughly considered, twice before the Circuit and twice before the Supreme Court. Chief Justice *Marshall* delivered the opinion of the Court, upon the first hearing, at Washington, from which we extract the following sentences: "although we do not find the naked principle, that relief may be granted *on account of the ignorance of the law*, asserted in the Books, we find no case in which it has been decided, that a plain and acknowledged mistake is beyond the reach of Equity". And the decree concludes thus: "and we are unwilling, where the effect of the instrument is acknowledged to have been entirely mistaken by both parties, to say that a Court of Equity is incapable of affording relief". (8 *Wheaton*, 174.) And in the final opinion, delivered by Judge *Washington*, in this case, it is laid down as an incontrovertible principle, that "wherever an instrument, which purports to set out the contract, violates by omissions or insertions, the manifest intention of the parties to the agreement, Equity will correct the mistake, so as to produce a conformity in the instrument to the agreement". And the learned Judge assigns this obvious and most sensible reason for the rule: "the object of Courts is, to carry out the contracts of parties, fairly and legally entered into; and if the instrument, from want of skill or mistake, or *for any other cause*, is insufficient to execute the intention of the parties, the writing, itself, might be enforced, but the agreement, itself, would remain

as unexecuted—as if one of the parties had refused, altogether, to comply with his agreement; and a Court of Equity will, in the exercise of its acknowledged jurisdiction, afford relief, as well in one case as in the other, by compelling the delinquent party, fully to perform his agreement according to the terms of it, and the manifest intention of the parties". (1 *Peter's S. C. R.* 1, 14.)

It may be suggested that this was the mere *obiter* of the individual Justice. It will be borne in mind, however, that every opinion emanating from the Supreme Court of the United States, undergoes the revision and approval of the whole Bench. And I have learned from a reliable source, that a large portion of what is now considered as settled law in that tribunal, originated in *dicta*, similar to this which I have cited. The principle then, thus enunciated as *incontrovertible*, comes clothed with the moral, if not the legal sanction of a judgment.

Counsel for the defendant in error, profess their willingness to stand or fall by the doctrine, as taught by Judge *Story* in his Commentaries on Equity. And they insist on binding us by that authority. To that, then, let us go.

In his *Fifth Chapter*, on *Mistake*, he commences by expounding the well-known maxim, that ignorance of law will not furnish an excuse for any person, either for a breach or an omission of duty. He then proceeds to state numerous exceptions to the rule, until he reaches the 136*th Section*, where the author thus continues : "there are also some other cases, in which relief has been granted in Equity, apparently upon the ground of mistake of law. But they will be found, upon examination, rather to be cases"—of what?—"defective execution of the intent of the parties, from ignorance of law, as to the proper mode of framing the instrument".

Now, I ask, is not the case made by the amended bill, in literal conformity to the very language of the learned commentator? Indeed, I should infer that the pleader, in framing this amendm n , did it with this identical paragraph before his eyes. If the text in this treatise, as just quoted, is the law of this case,

and we hold that it is, then is there Equity in this amended bill.

But it is earnestly and ably argued, that there is a wide difference between the reformation of a contract, drawn by a scrivener, under instructions from the maker, and the correction of a paper, framed by the party himself. We confess, candidly, that we are unable to comprehend the distinction. That the proof will be more difficult in the one case than the other, I can readily perceive.

But I direct a scrivener to prepare an instrument for a certain purpose. It is read to, or by me, executed and delivered. A mistake, here, it is conceded, is relievable. What difference can it make, if I, myself, have drawn the contract? In the latter case, I repeat, it may be more difficult to prove that the defective execution of the intent of the party, was the result of ignorance of the law, but in principle, the two cases occupy the same footing. Neither Judges *Marshall* or *Washington*, Judge *Story*, or any one else, who has discussed or adjudicated this question, recognize any such distinction as that now made, viz: whether the instrument was framed by the party, himself, and some third person. And this is the only change made in the original bill, by the amendment.

Now, I grant, that if the bill charged, that owing to the confidence of the party in the scrivener, he omitted to scrutinize the instrument closely, this would constitute an independent ground of Equity: otherwise, it is immaterial whether the party, himself, or another, be the draftsman. The doctrine rests on no such distinction.

[4.] In every case, under this head of the Law, the only inquiry is, does the instrument contain what the parties intended it should, and understood that it did? Is it their agreement? If not, then it may be reformed by *aliunde* proof, so as to make it the evidence of what was the true bargain, or contract, between the parties. And it is wholly immaterial, from what cause the defective execution of the intent of the parties originated.

But another ground has been argued against the maintenance

of this bill. Whether it was taken in the Court below, the record does not disclose.

[5.] We are daily impressed with the difficulties under which we labor, and the increase of work in which we are involved, in having questions upon demurrers, amendments to pleadings, &c. brought up for review before this Court, which have not been distinctly presented to and actually passed upon, by the Superior Court. It is a growing evil, and one which ought to be corrected. The Court of Errors, in New York, stood in the same relation to the Supreme Court and Court of Chancery in that State, that this Court does to the Superior Courts here. And the Organic Law, creating these appellate tribunals, was very similar. And it was repeatedly decided and considered settled law there, that no matters assigned for error, would be heard, except such as were actually passed upon by the Court below. (*The President, &c. of the Bank of Utica vs. Smedes,* 3 *Cowen,* 662, 684; *Golden vs. Knickerbocker,* 2 *Ib.* 49, 50; *Gelston, &c. Al. vs. Hoyt,* 13 *Johns. Rep.* 561; *Wood vs. Young,* 5 *Wend.* 637; *Campbell, adm'r, &c. vs. Stokes,* 2 *Wend.* 146, *Per Walworth, Chancellor; Houghton vs. Starr, adm'r, &c.* 4 *Wend.* 179; *Ward vs. Lee,* 13 *Wend.* 41.)

[6.] But waiving this for the present at least, let us consider this second objection. It is contended, that the conveyance from old man Wyche being voluntary, that Equity will not enforce, that Greene and the complainant are both volunteers; and that between such, Equity will not generally interfere, but leave the parties, as to title, where it finds them ; that it will not aid one volunteer against another; neither will it enforce a voluntary contract.

[7.] To this rule, there is an important qualification. If the contract is actually executed, then a Court of Equity will enforce all the rights growing out of the contract, against any body. Here, the gift having been consummated by the donor, by the delivery of the title-paper, together with the negroes, it would be enforced against him and all others, in favor of all

who have rights growing out of it. See 1 *Story's Eq. Jur.* § 433, and *note* 3.

And is not this right? In the apparent conflict of Courts and cases, it is always well, to let conscience speak. Now Mr. Greene having taken the instrument, with notice, and, therefore, knowledge, that it was designed to give the slaves, and their increase, to his wife for life, and after her death, to her children, would it be just that he should hold on to the remainder, and refuse to surrender it up, after the termination of the life-estate, by the death of Mrs. Greene?

Rectify this instrument, and there is no conflict between the titles of these parties to this property. One took an estate for life: the other the remainder in fee. The one having taken effect, and been fully enjoyed, shall not the defendant be adjudged a trustee, holding for the benefit of his children?

[8.] We are aware that the difficulty of supporting his case, by proof, will be great. The testimony, under all the circumstances, should be overpowering; not only on account of the antiquity of the transaction, but likewise, because Mr. Wyche, himself, penned the paper. The Jury must be satisfied, beyond a reasonable doubt, that at that very point of time, his purpose was to frame the instrument, otherwise than as he did. This will be hard to do—still, it will not be impossible. And the complainants are entitled to the privilege of making the effort. If they fail, it will be for want of evidence, and not because they are denied the opportunity of adducing it. Their miscarriage will then be their misfortune, and not the fault of the Courts.