LINDSEY H. DURHAM AND WIFE, plaintiffs in error, vs. SETH K. TAYLOR, executor, defendant in error.

[1.] If the proof to rectify a written contract, is sufficient to satisfy a jury beyond a reasonable doubt, it is as much as is necessary.

[2.] A written marriage contract is subject to be rectified by the verbal contract which it was to reduce to writing, in every case in which not allowing it to be so rectified, would be to allow one of the parties to it, to perpetrate a fraud on the other.

[3.] One witness and circumstances sufficient to give a clear preponderance against the answer, will suffice, to overcome the answer.

All the facts necessary to a full understanding of the points adjudicated in this case, are embodied in the following opinion of the Court.

Durham et ux. vs. Taylor, ex'or.

HAWKINS, STROZIER, SLAUGHTER, and LYON, for plaintiff in error.

MORGAN; and ROBINSON, *contra.*

*By the Court.*—BENNING J. delivering the opinion.

Did the Court below err, in refusing the motion for a new trial? We think so; we think, that some of the grounds of the motion, were good, which these are, will be seen, as the grounds are disposed of.

The first ground was as follows: "The Court erred in charging the jury, that the proof necessary to reform a marriage contract, must be *indubitable;* and, in the further part of the charge, in saying, that it required irrefragable proof."

[1.] Proof that is sufficient to satisfy the jury beyond a reasonable doubt, is as much, we think, as is necessary; such proof is sufficient to justify a verdict of murder, and, the consequent taking of human life; such was the proof recognized, if not decided, to be sufficient, in *Wyche and wife vs. Greene,* (16 *Ga.* 63)—a case for rectifying a deed, on parol evidence.

"Irrefragable," " indubitable," proof, is proof of a degree beyond this.

This ground then, we think, was good.

The second ground was as follows; " In charging, that if the marriage contract is reduced to writing, before marriage, containing the intention of the parties, it cannot be altered or amended, afterwards, under the statute of frauds."

It is certainly true, that the writing, if it expresses the "intention" of the parties, will be free from liability to be altered or amended; but the statute of frauds, was not needed to give to it, this exemption; there never was any law allowing a writing to be so " altered" or " amended," as to make it cease to speak the " intention" of the parties to it; and that would be the effect of any alteration or amendment of a

writing, if the writing, expressed, the "intention" of the parties.

We see nothing amiss, in this ground, as the ground stands expressed.

The charges in the third, fifth, and seventh grounds, are nearly related. Those three grounds, therefore, will be taken up one after another.

The charge contained in the third ground, amounts to this proposition; that a written agreement is not to be corrected by any verbal agreement made prior to it, or contemporaneous with it. Is this proposition true?

It is a proposition of wide extent; it does not except cases of fraud; it is equivalent to this, that, in no case, is a written contract, to be corrected by a verbal one, not even in the case in which, not to allow the correction, would be to permit one of the parties, to perpetrate a fraud on the other.

But the contrary of this, has been held by this Court, in several cases, and, especially, in the case of *Wyche and wife vs. Greene*, (16 *Ga.* 49.) In that case, the decision was, that the written agreement was to be corrected by the verbal agreement, and the case was one in which, not to have allowed the correction, would have been, to permit one of the parties, to perpetrate a fraud on the other. (And see *Browne and wife vs. The Savannah Mutual Insurance Co.*, 24 *Ga.* 97.)

This decision, the counsel for defendant in error, do not question; they, consequently, admit, that the proposition is not true of some of the cases which it covers. But they say, that the decision does not apply to the present case; they say, that that case was not within the fourth section of the statute of frauds, and, that this is the reason why the decision was right; and they say that the present case is within that section, and, therefore, that the same decision would not be right in the present case. Their argument may be thus stated. The statute of frauds says, that, "No action shall be brought whereby, to charge" "any person upon any" verbal "agreement made upon consideration of marriage." If

no action is to be brought on "any" such verbal agreement, then none is to be brought on such a verbal agreement, even in the case in which, not to allow one to be brought on it, would be to permit one of the parties to it to perpetrate a fraud on the other; consequently, even this extreme case, is not excepted from the operation of the statute.    The bill, in the present case, is "an action" brought, first, to correct a written marriage contract, by the verbal contract which preceded it; and, secondly, to enforce the written contract, when corrected by the verbal.    The written contract, when thus corrected by the verbal, will, in reality, be only the verbal.    Therefore, the action is, in reality, an action to enforce the verbal.    Consequently, it is an action which, the statute says, shall not be brought, even though it might be true, that the case were such, that not to allow it to be brought, would be, to permit the defendant or his testator, to perpetrate a fraud on the plaintiff.    However, it is not true, that the case is such a case as that, and therefore, the case is not excepted from the statute, even if that case is.    This is their argument.

Is this a good argument?

And first, is it true, that the meaning of the statue, is, that not, in any case, can a marriage contract reduced to writing, (or any of the other contracts mentioned in the fourth section of the statute,) be corrected by the verbal contract which preceded it—not even in a case in which, refusing the correction, would be allowing one of the parties, to perpetrate a fraud on the other.

Does the statute mean this?

It certainly does not, if decisions are the test of what it means.    They say, that it had for its main object, the suppression and prevention of frauds; and, therefore, that, when it interferes in a case of fraud at all, it interferes against the fraud; that, it never interferes in a case of fraud, to aid and protect the fraud.    The principle they affirm, may, for practical purposes, be thus expressed; fraud takes any case out of the statute of frauds.    And it is not necessary, that this

fraud should be actual positive fraud; if it be constructive fraud, that will be sufficient; for example; if one of the parties to a verbal contract relating to land, has done certain things in part performance of the contract, and the other refuses to perform his part of the contract, his conduct will be construed to be, the result of an original fraudulent design, and he will be compelled to perform his part of the contract.

The decisions go further; they say, that if, by *mistake*, a writing fails to express the contract as verbally made, the writing will be rectified, so that it shall express the contract as verbally made. Perhaps, however, the refusal to correct a plain mistake, is, itself, to be construed into a fraud.

In short, what the decisions say, is, that the written contract is to be corrected by the verbal which preceded it, in every case in which, not to allow it to be so corrected, would be to permit one of the parties to it, to perpetrate a fraud on the other; and, in every case in which, the failure of the written contract, to accord with that verbal one, was occasioned by a plain mistake. To show that this is so, some of the decisions will now be briefly stated, and others, be named.

First, however, I will refer to a very large class of cases, without naming one of them, the class in which there has been a part performance of the contract. These, it is held, are not within the statute. (1 *Sug. Vend.* 200.) And why? Because in them, not to hold the nonperforming party bound, would be to permit him to practice a fraud on the performing party. It is fraud then, that takes these cases out of the statute, and they are a host in themselves. And if fraud is sufficient to take them out of the statute, why is it not sufficient to take any case out of the statute?

And is there any good reason why, marriage should not be considered a part performance of a marriage contract, so as to take that contract out of the statute? The reason assigned in *Montecute vs. Maxwell*, (1 *P. Wms.* 618) is, that, until the marriage, the promise is not within the statute at all. True, the words of the statute, are, "upon consideration of

marriage," not, of a promise to marry. But if we say, that these words mean only cases in which marriage already taken place, is the consideration, we exclude all cases of ante-nuptial marriage contracts; and, it seems to me, that we must say, they mean this, if we say, that, until marriage, the agreement is not within the statute. But who will say, that they mean this? Besides, if an ante-nuptial agreement is not within the statute before the marriage, how can it be so afterwards? The consideration of an ante-nuptial agreement, is, *a promise* to marry. That remains the consideration, after the marriage. The marriage is the performance of the promise, not its consideration. By the marriage, then, the agreement does not cease to be an agreement in consideration of a *promise* of marriage, and become an agreement in consideration of *marriage.* How, then, can the marriage draw the agreement within the statute, if it was not there before? Certainly, we may admit, that, if it took part performance, (marriage,) to draw the case within the statute, it would appear absurd to say, that that same part performance should draw it out.

What say justice and equity? Do they not say, that these cases of marriage contract, are often the very ones which marriage, as part performance, ought to take out of the statute? In the other cases, the injured party, if he has parted with his property, in performance of the contract, and that fails, may recover it back; but, in these cases, if the wife has parted with her property, and the contract fails, that property is gone; the moment the contract gets out of the way, the marital right of the husband steps in, and swallows it all, at a mouthful.

Nay all of her rights are gone; she has become a married woman, and thus has merged in her husband; and his conduct, in repudiating the contract, is not even a ground to her, for demanding a divorce. Indeed, a divorce, if she could obtain one, could not restore her, to all she was, if it could, to all she had, before the marriage. Great and irre-

parable is the mischief, if the contract be held void.  I myself, therefore, much doubt whether, in cases of this kind, marriage is not such a part performance as takes them out of the statute.

I will now briefly state some cases and mention others.

"There was a verbal agreement for an absolute conveyance of land, and for a defeasance to be executed by the grantee; but he having obtained the conveyance, refused to execute the defeasance and relied upon the statute; but his plea was overruled and he was compelled to execute according to the agreement." *Brown on Stat. Frauds S.* 441; *Citing Vin. Abr.* 523–24.

This was a case which happened in Lord Nottingham's time, soon after the passage of the statute.  It has been followed by many cases.  (See 1 *White & Tudor Eq. Cases* 663 *top.*)  With us it took a statute, to break this current of decisions—the statute of 1837, ' to regulate the admission of oral evidence" "in certain cases."  That statute itself, however, goes no further, than to restrict the parol evidence. It confines its use to showing "the fraud only."

"In *Pember vs. Matthews,* a bill was filed for a specific performance of a parol agreement, by a purchaser of a lease under written conditions, to indemnify the vendor, against the rent and covenants; and it was objected, on the part of the defendant, that the evidence was inadmissible, upon the ground, that where the parties have entered into a written agreement, no parol evidence can be admitted to increase or diminish such agreement.  The rule Lord Thurlow said, was right; but where the objection was originally made, and promised by the other party to be rectified, it comes amongst the string of cases where, it is considered as a fraud.  Then the evidence is admissible.  There being some doubt as to the fact, Lord Thurlow ordered it to go to law, upon an issue, whether there was such a promise on the day of the execution of the agreement.  Upon the trial the jury found, there was such a promise; and the

plaintiff had a decree for a specific performance.   1 *Sug. on Vend.* 270, *Citing* 1 *Bro.* 66, 52.    This case still stands— notwithstanding any thing said by the Master of the Rolls, in *Clark vs. Grant* 19 *Ves.* 24.

Similar in principle, and quite as strong, are *Coldcat vs. Serjeant Hyde,* 1 *Ch. Ca.* 16 ; 1 *Sug. Vend.* 262 ; *Fielder vs. Studley,* 1 *Sug.* 20; *Thomas vs. Davis,* 1 *Sug.* 264 ; *Rob. vs. Butterwick, Sug.* 265 ; *Leak vs. Morrice* 2 *Cas. Ch.* 135.

Also all those cases in which, it has been held, that " if a man procure a certain devise to be made to himself, by re- presenting to the testator, that he will see it applied to the trust purposes contemplated by the latter, he will be held a trustee for those purposes."    *Brown on Stat. Frauds, citing Harris vs. Howell, Gilb. Eq. R.* 11 ; *Chamberlaine vs. Cham- berlaine,* 2 *Freem.* 34; *Devenish vs. Baines, Prec. Ch.* 3 ; *Oldham vs. Litchford,* 2 *Vern.* 506 ; *Flynn vs. Flynn,* 1 *Vern.* 293 ; *Hoge vs. Hoge,* 1 *Watts Pa.* 163 ; *Burrow vs. Greenough,* 3 *Ves.* 151, *as contra.*

In these cases the promise is verbal ; and is a " contract" " of lands, tenements, hereditaments, or," an " interest in or concerning them."    (See words of the statute.)

The case of *Cooks vs. Mascall,* 2 *Vern.* 200, is thus stated in *Brown on the Statute of Frauds, sec.* 443.   " A marriage was about to be celebrated between the plaintiff and defen- dant's daughter, and the Solicitor on behalf of the plaintiff was in the course of preparing articles of settlement; and in the meanwhile a disagreement arose as to the articles, but the plaintiff was still allowed to come to the defendant's house, and afterwards married his daughter, the defendant being privy to it, helping to set them forward in the morn- ing, and entertaining them, and seeming well pleased with the marriage upon their return to his house at night; he was decreed to execute the agreement according to what had been drawn up by the Solicitor, though it had not received his signature."

Here, if there was any promise at all by the father, to

execute the articles, it was but a promise in law—a promise
by construction, and that certainly was a thing hard to make
out, in the face of his objecting to the articles, yet he was
compelled to execute them.    In our case the husband most
solemnly promised to make the marriage contract right.

In the same work, the striking case of *Montacute vs.
Maxwell,* is thus stated.    "In *Montacute vs. Maxwell,* as
appears from one of the reports of that case (1 *Eq. Cas.
Abr.* 19,) the defendant having given instructions to have a
marriage settlement drawn, privately revoked those instruc-
tions, and persuaded the plaintiff to marry him ; and he
was decreed to execute the settlement, the Lord Chancellor
as stated in still another report of the case (*Prec. Ch.* 528)
asserting the rule to be that if the parties rely wholly on the
parol agreement, neither party can compel the other to the
specific performance, for the statute of frauds is directly in
their way ; but if there is any agreement for reducing the
same to writing, and that is prevented by the fraud and
practice of the other party, the Court would in such case
give relief ; as, where instructions are given and prepara-
tions made for the drawing of a marriage settlement, and
before the completion thereof the woman is drawn in, by
the assurances and promises of the man to perform it, to
marry without a settlement." *Brown Stat. Frauds, sec.*
445.)    See first of *Strange,* 236, for another report of this
case.)

Other cases of marriage contract in which, a specific per-
formance was decreed, are the following : *Mallet vs. Half-
penny,* 1 *Eq. Cas. Abr.* 20 ; *Baudes vs. Amherst Prec. Ch.*
404 ; *Young vs. Young* 1, *Dickens* 295, *Cited ; Rogers vs.
Earl,* stated in 1 *Sug. Vend.* 264.

These are enough ; they show, if decisions can show it,
that the statute of frauds does not mean to say, that a written
marriage contract, or other of the contracts within the fourth
section of the statute, is not to be reformed and corrected, by
the verbal contract which preceded it, whenever, not to allow

the correction, would be, to permit one of the parties, to perpetrate a fraud on the other. They show, in short, that fraud takes any case out of the statute. On the question, what will, or will not, make a case of fraud, there will, I admit, be a difficulty in reconciling all the decisions. But, once grant, that the case is a case of fraud, and they all agree, that it is out of the statute.

This being the interpretation of the statute, by the decisions, are we not bound by it, even although, it may be true, that the statute, taken by its letter, is susceptible of a different interpretation, perhaps requiring a different interpretation? We think so. These decisions started with the statute, they traveled with the statute, they have reached us with the statute. Having thus run with the statute in so long a journey—almost through centuries—they ought, at length, to be considered as having grown to the statute, and as now making a part of it.

Even if the statute were a new statute, I should doubt whether it could take any other construction, in cases in which, the agreement has been reduced to writing, but incorrectly reduced to writing, and the effort is, to have the writing corrected, and enforced as corrected. The statute says that the agreement, or "some memorandum or note thereof," shall be in writing. Now when an agreement is corrected, is it not still the same agreement? Has it lost its identity? Does patching a boot, make it a different boot? or amputating a man's leg make him a different man? or changing an averment in a declaration, make it a different declaration? Why then should amending an agreement, make it a different agreement? But if, after its amendment, it still retains its identity, then if it was a written agreement before the amendment, it will be a written agreement afterwards, and that will be a compliance with the first alternative in the statute; namely, that the "agreement" must be in writing.

At least, may we not say, that the incorrect writing will be

Durham et ux. vs Taylr, ex'or.

a compliance with the second alternative of the statute? will it not suffice, for a "memorandum or note" of the agreement? There must be a difference between *agreement* and, *memorandum* or *note of agreement*. And what must that be? I take it, the difference between completeness and incompleteness. *Agreement* is the contract complete; *memorandum* or *note of agreement* is the contract incomplete, imperfect, even, it may be, somewhat inaccurate, but which may aid us in getting at the complete contract.

[2.] We think, then, upon the whole that a written marriage contract, or any other of the contracts referred to in the fourth section of the statute of frauds, is subject to be corrected by the verbal contract which it undertook to reduce to writing, in every case in which, not to allow the correction, would be, to allow one of the parties to the contract, to perpetrate a fraud on the other. We think, that the statute is to be so construed, as not to prevent the correction in such a case. Consequently, we do not yield to the first branch of the argument of the defendant's counsel.

Secondly, ought the second branch of that argument to prevail? That branch was, that the present is not a case in which, refusing a correction of the written contract by the verbal, would be allowing Duncan, to perpetrate a fraud on Mrs. Bryan.

What then is the present case, according to the pleadings, and to the proof? According to the bill, the case, or, at least so much of it, as is pertinent here, is, substantially, as follows:

A. B. Duncan proposed marriage to Mrs. E. A. Bryan, and, to induce her to accept the proposition, promised her, to convey, to her separate use, the whole of her negroes. He took a list of the negroes, to be used in the drafting of the contract; and, on the next day, he presented, to her, a paper for execution, which, he falsely represented to be, a "consummation of the contract." This paper was read to her, by Harry Herrington, in presence of him, Duncan. Herrington

advised her, that the paper was "in violation" of the contract. Thereupon, Duncan interposed, and said; " that Herrington was mistaken; that said paper was drawn up by a skilful lawyer, and" " was precisely in accordance with the agreement, and did settle the whole of the negroes upon" her, "as her sole separate property, and to no one else; called upon the said Herrington and his wife, to bear witness, that if" Mrs. Bryan " would consent, to sign it, with him, and unite with him, in marriage, he" " would afterwards execute just such a settlement as would suit" her, " whenever she should be satisfied, that the one then presented, did not carry out their agreement." She, relying on the statement, that the paper did settle upon her, the whole of her negroes, to her separate use; and, her fears being appeased by Duncan's promise, that if the paper did not convey the property to her separate use, whenever this should be ascertained, he would execute any other conveyance that would convey it to her separate use, signed the paper, and a few moments afterwards, married him. The paper was, in fact, a violation of the agreement in these particulars, viz: it gave Duncan, a life estate in the negroes; it gave him, "a title in fee," to them, on condition, that he survived her, and she left no children of the marriage; it conveyed " a title in fee," to the children of the marriage, surviving her, reserving an estate for years, to Duncan; it conveyed the property, to the children of the marriage, jointly with her, to vest absolutely at the death of Duncan; that she was to have the property, in fee, only upon condition, that she survived Duncan and no children of the marriage, survived her. The prayer in effect, is, that the written contract may be reformed and changed, so that it shall accord with "the contract or original agreement;" and that the complainants may have the benefit of it as so reformed and changed.

This is the case, according to the bill.

The proof was such, that it would have authorized the jury, to believe the case made by the bill, true.

This then being the present case, is it true, that it was a case in which, refusing a correction of the writing, would not have been permitting Duncan, to perpetrate a fraud on Mrs. Bryan?

And we think, that it is not true—supposing the facts to be, as stated in the bill. We think, that refusing the correction of the writing, would be to sanction a fraud perpetrated by him, on Mrs. Bryan. We think, that he was guilty of actual fraud, towards her. He not only gave her his own word, that the writing truly expressed the contract, but he made her believe, that he had the word of a skilful lawyer, that it did. Not content with this, he called upon the persons present—persons who were her near relations, and her trusted friends—to bear witness, that, if, after all, the writing did not truly express the contract, and that should afterwards be discovered, he would correct it, and make it truly express the contract. He had her love, and therefore he had her confidence, almost as much, perhaps, quite as much, as, if he was already her husband. Plied in such a way, by such a person, she signed the writing. That did not, by a great deal, truly express the contract. There was nothing in the conduct of Duncan, afterwards, going to show, that he thought the writing expressed that contract. If these things are true, Duncan was, we think, guilty of procuring Mrs. Bryan's signature to the writing, by actual fraud—by wilful and intentional deceit.

At least, he was guilty of constructive fraud. This conduct of his, was conduct which had a strong *tendency*, to deceive, if it was not intended to deceive, and it did deceive. It makes a stronger case of fraud, than were many of those above cited—especially *Pember vs. Matthews, Cookes vs. Mascall, Montecute vs. Maxwell.*

So much then for the argument of the defendant's counsel in both its branches. We think it not sufficient to show that the case is within the statute of frauds. We think that fraud

takes a case out of that statute, and that there is fraud in this case.

Deeming this argument, invalid, we of course, have to regard it as not sufficient to support the charge of the Court, which, as we have seen, went in effect, this length; that a written marriage contract was not to be corrected by the verbal one, which preceded it, in any case, not, even in the case in which, not to allow the correction to be made, would be, to allow one of the parties to practice a fraud on the other. No other argument occurs to us which, we think, is sufficient to support that charge, therefore, we think it erroneous.

The next ground to be considered, is, the fifth.

This ground consists of a charge of the Court, and· that charge, if not the same, in substance, as the charge in the third ground just considered, is, in effect, as follows: That a written marriage contract, if it is " understood" by the parties to it, is not subject ·to be changed by evidence, that the .man, at the time of its execution, verbally promised the woman, that if she would execute it, he would afterwards make it satisfactory to her. Supposing the charge to have been this, was it right?

It was not right, if the decision in *Pember vs. Matthews*, *(supra,)* was right. In that case, Lord Thurlow said—" but where the objection was originally made and promised by the other party to be rectified, it comes amongst the string of cases where it is considered as a fraud." And, in that case, there did not exist, any confidential relation between the parties, like that which exists between two persons who are engaged to be married to each other and whose appointed time of marriage has actually arrived.

The case of *Coldcat vs. Hide*, and that of *Fielder vs. Studley*, (both cited above,) go quite as far as *Pember vs. Matthews*.

So, also, does the whole large class of cases, in which, a verbal promise to execute a defeasance, made on the execution of the absolute deed, has been enforced. So, equally, does

that other class of cases in which, a verbal promise by the devisee to apply the land devised to him, to the trusts contemplated by the testator, has been enforced.

We are not prepared to say, then, that this charge was right; but, even, if it was right, we think, it should have been accompanied with a caution to the jury, that, if they believed, that Duncan assured Mrs. Bryan, that the writing was the same as the contract agreed on, and was the work of a skilful lawyer, and she signed it in reliance on this assurance, they ought not to believe, that she did understand the writing.

This, of course, is said on the assumption, that what the bill says as to what was the contract agreed on, is true.

The next ground to be considered, is the seventh; which consists of a charge of the Court, to this effect, that if, at the time, when the writing was executed, Duncan represented to Mrs. Bryan, that it gave to her, what it distinctly declared, she should not have, the representation is " inadmissible," to " contradict" the writing, unless she was " deceived as to what it contained." Was this charge right?

Even granting, that Mrs. Bryan was not mistaken as to what the writing contained, yet, according to *Pember vs. Matthews*, and the other cases just referred to, she had the right, to rely on the promise of Duncan, (if there was one,) that, if the writing did not contain the contract, he would make it do so.

Besides, if Duncan assured her, that the writing was the same as the contract agreed on, and that it was the work of a skilful lawyer, and if she signed the writing in consequence of this assurance, the jury ought to have concluded, that she *was* "deceived" as to the contents of the writing. And this, the Court ought to have told the jury, along with the other charge, even if that charge was legal. But we do not say that it was legal.

We, then, think, that this charge was erroneous.

Durham et ux. vs. Taylor, ex'or.

So much for the three charges taken up in succession, the third, the fifth, and the seventh.

I go to the fourth ground, and dispose of it in a word, it is like the first ground, and what was said of that, is said of it.

[3.] The sixth ground was a charge to the jury, that " when the answer of the defendant, is responsive to the allegations in the bill, it is evidence, and must be received, unless it is overcome by the testimony of two witnesses, or, one, and strong corroborating circumstances."

We, think, that the word " strong," ought to have been omitted. We know of no decision, that the corroborating circumstances must be " strong." And the rule as laid down by the best elementary writers, does not include the word, strong. If the circumstances are such as to give a clear preponderance against the answer, that, we think, is enough; the answer is " overcome."

We find nothing in the evidence, to authorize the charge stated in the eighth ground. We find nothing in the evidence, going to show, that Mrs. Duncan bestowed her property on her husband.

In respect to the ninth ground, it is sufficient to refer to what has been said of the third, and fifth, and seventh grounds.

The tenth ground was as follows: " The Court erred in charging the jury, that if the testimony showed, that the provisions of the marriage contract, and the will, were explained to Mrs. Duncan, in the Court of Ordinary; and also, that after the explanation, she expressed to the witness, that she was satisfied with the arrangement of setting aside the contract, and made no complaint about it not being in accordance with the original contract, that constitutes a circumstance, to show it was in accordance with the original contract."

There is nothing in the evidence to show, that the provisions of the marriage contract, and those of the will, *were* explained to Mrs. Duncan. It is true, that it appears in the

evidence, that, in the Court of Ordinary, when the will was propounding for probate, Gen'l Morgan, in the presence of Mrs. Duncan, stated; "that the contract and the will gave her about the same things"—but this is no explanation of what the contract gave her, or, of what the will gave her. A part of her case as stated in her bill, is, that Duncan told her that the contract was drawn by a skilful lawyer, and gave her the whole of her negroes to her separate use; and that she relied on this statement. Now, if she understood Gen'l Morgan to mean, that the will too, gave her all of her negroes, her assenting to the abrogation of the contract, was not even a "circumstance," to show, that the contract as written, was "in accordance with the original contract." And for aught that appears, she might have so understood him.

At any rate, the Court ought also to have told the jury, that if Mrs. Duncan's election to take under the will, was a "circumstance" to show, that the written contract was correct, it was a very slight one, as there were so many other, supposable motives for her conduct in making the election.

The eleventh charge was, as follows: "The Court charged the jury, that if the complainant, Mrs. Duncan, consented to the cancellation of the marriage contract, in the Court of Ordinary of Lee county, and, with knowledge of her rights, elected to take under the will of Alexander B. Duncan, and the parties acted under it, she then cannot recover in the suit, or have the contract reformed."

This charge, we think, needed explanation—needed particularizing, as thus; that, if Mrs. Duncan had the right, to repudiate the contract as written, and to insist on what she says was the contract agreed on, and if she knew this, then, if she elected to take under the will, and the executor had acted on that election, in such a way, that he, or the estate, would be injured, unless she were held bound by her election, she was bound by that election; otherwise by it she was not bound.

It was argued, that if she was allowed to claim under the

contract, the effect would be hard upon the two children by Duncan, as in that case, she would, by the contract, get all of her own property, and, by the will, get also, a third of his property. But, we suppose, that if she elects to take under the contract, she will deprive herself of the right to take anything, under the will. This however is a point not strictly in the case, and, therefore, it is not decided.

The twelfth ground was, that the verdict was not authorized by the evidence. We think, it best, not to express an opinion on this ground.

The thirteenth and last ground involves the same point as the twelfth. We dismiss it, therefore, with a single remark, viz: that the charge stated in it, seems not to be consistent with some of the previous charges.

Judgment reversed and new trial granted.