## GREEN *v.* JOHNSON.

1. The verdict is contrary neither to the evidence nor to the law.
2. Grounds of a motion for new trial, complaining that the verdict is contrary to certain instructions of the court, are equivalent to an objection that the verdict is contrary to law, and are embraced in that single objection; for if the charge be not law, the verdict will be upheld though against the illegal charge.
3. Equity will not lend its aid to reform a written contract because of mistake as to its contents on the part of a complaining party who was able to read, and fraud of the other party which consisted only in making false representations as to such contents, on which the complaining party relied as true because of confidence in the party making them, no confidential relation existing between the parties, and no sufficient excuse appearing why the complaining party did not read the instrument; but this principle does not apply to actions for the reformation of instruments which, by mutual mistake, do not evidence the true agreement of the parties.
4 (3). In all cases where the form of the conveyance or instrument is, by mutual mistake, contrary to the intention of the parties in their contract, equity will interfere to make it conform thereto.
5 (3). Reformation may be granted even in cases of negligence by the party complaining, if it appear that the other party has not been prejudiced thereby.
6 (4). The court did not err in permitting the plaintiff to testify that he gave to a real-estate broker written authority to sell one half of a certain lot, on the ground that the writing containing such authority was the best evidence of its existence; the witness not stating the contents of the writing, but the mere fact that such written authority had been given.
7 (5). Parol evidence is admissible to prove a mutual mistake in a deed or any other written instrument.

Nos. 2958, 2959. JULY 11, 1922.

Reformation of agreement. Before Judge Meldrim. Chatham superior court. October 24, 1921.

Coleman Johnson filed his petition against Lester Green, returnable to the October term, 1920, of Chatham superior court. He alleged, that on March 23, 1919, he placed in the hands of Stillwell Realty Company for sale that certain house and lot designated on the official map of the city of Savannah as the northern one half of lot 133 Johnston ward; that the Stillwell Realty Company negotiated a sale thereof to the defendant, Lester Green, and executed to the purchaser a sale ticket thereto, in which the property is described as " 797 Wolff street in Johnston ward;" that the house and lot described in the sale ticket as " 797 Wolff street " is the same property as the northern half of lot No. 133;

Johnston ward; said northern half extending from Wolff street to a high board fence dividing the whole of said lot exactly in half, and separating the northern half from the lot and houses on the southern half, which border on a lane and face in the opposite direction from the house on the northern half, and are known as 794 and 796 Hall Lane East; that on the same day when the sale ticket was executed petitioner and the defendant executed a certain agreement for title, based on the sale ticket, to cover the same property; that by error of the scrivener the property was described in said agreement for title as "lot one hundred and thirty-three (133) Johnston ward" instead of the northern half of lot 133 Johnston ward, as it should have been; that petitioner only intended and thought he was conveying the northern half of said lot; the defendant well knew that the agreement for title was only meant to cover the northern half of said lot 133 Johnston ward, with improvements thereon, and never had meant and did not mean to purchase the whole of said lot and the several houses thereon; that the defendant at once informed the tenant in the house on the northern half of said lot of the purchase, and at once began to collect the rent therefrom, and several months later himself moved into the aforesaid house, and has been in the actual possession thereof since then, but the defendant did not then inform the tenants in the houses on the southern half of said lot that he was their landlord, nor did he attempt to go into possession thereof, nor to collect the rents therefrom, nor to make any demand on petitioner therefor; and it was not until some twelve months later that, being apprised of the error in the description, he attempted to collect the rents thereof, and made certain demands on petitioner for the possession of the same, and thereafter on April 16, 1920, placed on record the agreement for title; that at the time of the execution of the agreement for title petitioner did not own and was not in possession of the southern half of lot 133 Johnston ward, having conveyed the same to one George Clark, by deed dated September 12, 1913, of record in Chatham county, book of deeds 11-O folio 97; that the amount shown in the agreement for title as consideration for the same is a reasonable price for the northern half of said lot, but is grossly inadequate to cover the purchase-price of the whole of said lot and the improvements thereon, as the defendant then and there well knew or

should have known; that when the error was called to petitioner's attention he at once called upon the defendant to execute a quitclaim deed for the southern half of said lot, or to destroy the agreement for title and execute a new one on the same terms and conditions, limited to the northern half of said lot, which the defendant refused and still refuses to do.  Petitioner prayed that both copies of said agreement for title be so reformed as to express the intent both parties, and so that, when reformed, the description should read as follows: All that said lot or parcel of land lying and being in the State of Georgia, County of Chatham, the northern half of lot No. 133 Johnston ward, and improvements thereon.

In his answer the defendant denied that petitioner placed with the Stillwell Realty Company for sale a house and lot, designated on the official map of the city of Savannah as the northern one half of lot 133 Johnston ward.  He admitted the execution of the sale ticket, and that in said ticket the property is described as " 797 Wolff street in Johnston ward."  He denied that " 797 Wolff street " is the same property as the northern half of lot 133 Johnston ward.  He admitted the execution of the agreement for title, as set out in the petition.  He denied that the property conveyed was, by error of the scrivener, described in the said agreement of title as " lot 133 Johnston ward," instead of the northern half of said lot.  From lack of information he was unable to admit or deny that the plaintiff only intended and thought he was conveying the northern half of said lot.  He denied that he knew that the agreement for title was only to cover the northern half of said lot and improvements thereon, and that he had never meant, and did not mean, to purchase the whole of said lot and the several houses thereon.  He admitted that he at once informed the tenant in the house on the northern half of said lot of his purchase thereof and later on moved into the same; but denied that he did not then inform the tenants in the houses on the southern half of said lot that he was their landlord, that he did not attempt to go into possession thereof, nor to collect the rents therefrom, nor to make any demands on petitioner therefor, that it was not until some twelve months later, being apprised of the error in the description, he attempted to collect the rents thereon and make demands on petitioner for the collection of the same, and that

thereafter, on April 16, 1920, he placed on record the said agreement for title. From lack of information he could neither admit nor deny the allegation that petitioner did not own and was not in possession of the southern half of lot No. 133 Johnston ward, having conveyed the same to one George Clark by deed dated September 12, 1913, etc. He denied that the amount shown in the agreement for title as consideration of the same is a reasonable price for the northern half of said lot but is grossly inadequate to purchase the whole of said lot and the improvements thereon, as he then knew, or should have known. He admitted that the plaintiff called on him to execute a quitclaim deed to the southern half of said lot, or to destroy the agreement for title and to execute a new one on the same terms and conditions, limited to the northern half of said lot, and that he refused and still refuses to comply with said request. He further alleged that at the time he purchased the property in question he believed that he was buying the whole of said lot; that he was not advised of any adverse claim to any portion of said lot, and if he had known that he was negotiating for the northern half of said lot he would not have purchased the same for the price as agreed on by him, as said price was the full and fair value of the entire lot.

By amendment the defendant admitted that the sale ticket was made to him, but denied that it was for the northern half of lot 133 Johnston ward, but on the contrary was for the entire lot.

On the trial the plaintiff testified that the agreement for title was signed by him and he placed in the hands of the Stillwell Realty Company for sale the northern half of lot 133 Johnston ward, the street number of the same being 797 Wolff street. He gave the Stillwell Realty Company written authority to sell that one half. He only intended to convey the northern half of lot 133 Johnston ward, and did not intend to convey the whole lot, because it was cut in half when he built on the northern half. After dividing it he built two houses there, 197, 196, and 194 is the number of the house in the lane, and 797 is the front number on Wolff street. He sold the two houses to Clark & Clark, namely, the southern one half of that lot on September 12, 1913. Green came to him to rent the house in the front, and he was collecting the rent from the house in the front. Green came to him after he had bought the lot and spoke to him about collecting the rent.

There was a little rent that the man had paid in advance on 797 Wolff street, the northern half; and he gave Green a portion of the money back, after the sale. Green did not say anything to him about the houses on the southern half, or ask him anything about the rents. Plaintiff did not know what the whole lot and improvements were worth. The northern half was sold to Green for $2600. The other half, with improvements, is worth about $2000.— Cross-examination: Can read and write a little. The signature to the bond for title is his, but he did not read it over, as he thought they knew what was to be deeded. Mr. Williams, in the office of the Stillwell Realty Company, presented the paper to him and said it was a bond for title. Did not read it, as he had confidence in them that they would do the right.— Here the court said to the witness: " See if you can read out the writing part of it." The witness read as follows: " Green of said county, between Coleman Johnson of the second part, of said county and State of the first part, witnesseth the said party of the first part." He signed the paper which Mr. Williams drew up, because he said it was the proper paper.

A. F. King, for the plaintiff, testified: On March 22, 1919, he was vice-president of the Stillwell Realty Company, and on that date executed the sale ticket in question, the Stillwell Realty Company representing Coleman Johnson. The sale ticket is for 797 Wolff street. The agreement for title executed between Coleman Johnson and Lester Green was intended to follow, as to the property, the sale ticket. The agreement was drawn up by the Stillwell Realty Company, and was given to the plaintiff when the sale was made, and he came there and it was tendered to him for his signature.— Cross-examination: I drew the papers myself. They were signed in the presence of the two witnesses who attested them. I am unable to say whether I was present when they were executed. Not able to say whether they were read over when they were signed. I drew the bond for title for the purpose of conveying the property described in the memorandum of sale. The property in question was sold for $2600. I never saw this property until this morning. I went out there this morning, and consider the property worth about $3700 or $3800 as a whole.

Feay Shellman, for the plaintiff, testified: He was a draftsman in the city engineer's office, and made a drawing or map of lot 133

Johnston ward, the information having been furnished by R. M. Bailey, who made the survey. The map represents 133 Johnston ward as represented on the city map, and shows the entire lot of land. Said map does not show the lot as surveyed.

Roy M. Bailey, for plaintiff, testified: I prepared the information from which this map was drawn, a survey of lot 133 Johnston ward. The line in the middle represents the fence about 6 1/2 feet high, solid board fence. There is one house in the lane, the partition between them, making two houses, which face south; in front it faces north.. There are two separate lots so far as the dividing fence is concerned, but the city map does not show any division.. The fence is of a permanent character, and divides the lot in half.—.This map was introduced in evidence.

W. H. Stillwell, for plaintiff, testified: I was president of the Stillwell Realty Company on March 22, 1919. Am familiar with lot 133 Johnston ward, and the improvements thereon. I have been in the real-estate business ten years, and am well acquainted with the real-estate values in the city of Savannah. The reasonable value of lot 133 Johnston ward, with improvements, is $3800, and the reasonable value of the northern half of the lot with the house on it is $2600. It is my recollection that that was the price at which it sold. I know nothing of the execution of this bond for title, and I do not know how much this property is returned for taxes. The last time I saw it was probably two years ago. I only handled the property for Coleman Johnson for sale.

J. G. Christian, for the plaintiff, testified: Am a collector of rents for C. J. Hunter. Collected the rent for 794-96 Paulson Street East, on March 19, 1919, up to October 20. The defendant in this case made no demand on our office for the rentals of the property. In April, 1920, he made demand on me for the rent; and I went to see him, and he said he did not collect it. He said he owned the back; and I said, " Are you sure about that? " and he said " Yes." Subsequently to that he made no demands on me for the rent. After the tenants paid Green I demanded the rent. Am familiar with this property and have been a real-estate agent in Savannah for four years. Consider myself an expert and qualified to pass on real-estate values in Savannah. I consider the value of the lot 133 Johnston ward and improvements about $3700. The value of the northern half $2500 and the southern

half $1200.— Cross-examination: Lester Green claimed to own all the property, and when I had a talk with him Clark & Clark claimed to own the property. When their tenants refused to pay, I found that they paid to Green, and I went to find him, and he admitted that he did it. He said he owned the property, and I asked him why he did not collect the rent before, and he said he had to wait a year. Don't know why he should have waited a year.

Rebecca Singleton, for plaintiff, testified, testified: I live on Hall street, No. 789, live behind the house that Lester Green lives in next door to Sarah Turner. I do not recall when Lester Green moved into the house where I live. I recall his collecting rent from me in April, 1920. That was the first time he collected and the last time. I do not know that he made any claim on me for the house. I was not at home.

Sarah Turner, for plaintiff, testified: I live in Hall street Lane East, behind Lester Green, and next to Rebecca Singleton. Recall Lester Green collecting rent from me the first Sunday in April, 1920. He had not collected rent from me before. He did not ask me for the house. I paid my rent to Lockwood.

Lester Green for himself testified: I am the defendant in this case. About April 1, 1920, I asked the people staying in the house in the rear not to pay the rent to the collector. They paid me one month's rent. I remember when you (counsel for plaintiff) came to my house and asked me to execute a quitclaim deed to the southern half, which I refused to do. When I bought the house I thought it was worth $1800. I did not pay $2600 for it. I paid $2600 under the impression that I was buying the whole lot, $800 for that in the lane and $1800 for the house in front. That would make $2600. I signed the sale ticket, to cover 797 Wolff street. I do not know whether this agreement for title was meant to cover the same property. If I signed it, it meant the same. It meant to be the same property. Collected rent in April from Sarah Turner and Rebecca Singleton. Both came to my house and paid me for the rent in person. I do not know which one paid to my daughter. I do not know Matilda Lockwood. She did not pay any rent. I did not have any dealings with her. She was a peace-broker in the lane, so far as I know about. She makes confusion. I did not have any dealings with her. I went in March to collect rents. When I first noticed I went and tried to

collect rent. Q. You went as soon as you noticed it — within a few hours? A. It was in March. Q. As soon as you noticed it you went and tried to collect the rent? A. As soon as I noticed — I knew I bought the lot. I bought it in March. I knew I had bought the lot.

Cross-examination: George Jacobs took me to show me the property. He was a special agent of the Stillwell Realty Company. He showed me the entire lot and advised me to buy it, and carried me to Stillwell Realty Company's office. Came back to the office with me. At the time the sale ticket was signed he was present. That paper called for 797 Wolff street — that was the number on the house. Subsequently they drew up the bond for title. It was read over to me at the time it was signed, described lot 133 Johnston ward and improvements. Found out they were claiming I did not buy the lots when I went to get the returns from the rent collector. A man named Johnson collected the rent in the lane. Nobody mentioned to me anything about the 55 feet for a year after I tried to get a statement for the money collected. Immediately after the purchase I got the money from Coleman Johnson. That was the money for the house I am living in. I did not care for him to move. I wanted to turn over my account to help pay it. I let him continue to collect the rent on the rear part. It was in April, a year after, they claimed I was not entitled to the rent. Am now paying taxes on the entire property.

Redirect: I began collecting the rent on 797 Wolff street right away. Knew he was collecting the rent on the back houses after the sale. When I went to Mr. Christian he was collecting it. Mr. Christian came to me for information, and he went to Johnson. He told me that he was collecting the rent for Johnson, because he went to Johnson for information. I asked Johnson for rent in March, 1920. Did not ask him for rent on the front house. Did not say anything to him about the back house, as I intended to put it on my account: I told him that I did not care to collect that rent. He could collect that to keep me from paying percentage for collection.

Re-cross: When I went to buy the property from Mr. Williams, he delivered the bond for title and asked me if I would let Mr. King collect the rent for me, collect the rent for the house in the lane. I paid the installments direct to the Stillwell Realty Company.

Edward F. Lovell Jr., for the defendant, testified: I am in the city assessors' office, and am fairly well acquainted with the value of property in Savannah. We try to get two thirds of the market value; that is the proportion it is assessed for taxes. They usually run at fifty per cent. The taxable value of the entire lot 133 Johnston ward and improvements — the lot is valued at $225 and improvements $1400; the northern half would be $125 for the lot and the improvements $850 for the year 1921. For 1920 the northern half $800; the lot $800; the lot was $100 and the improvements $700; the entire lot is worth $175 for 1920, and $1375 for improvements, making $1550. I have not personally seen the property, and do not know anything about the value of the sale.

Matilda Lockwood, for plaintiff, testified: I live at 795 Hall street East, right behind this man's house. I rent the house from Rebecca Singleton and Sarah Turner, and they leave the money for me to pay the rent. I did not pay the rent to Lester Green. I paid the rent for Rebecca up to March. Green said not to pay the rent to the rent collector, and the collector came on Monday and I told him what Green said. After that I paid the rent to the owner of the house, and he told me to tell Rebecca and Sarah. I had a conversation with Green in the lane in April, 1920, and talked about his collecting the rent for the two back houses. He said he was just now trying to collect the rent to the two back houses; because he had not noticed before this time the deed called for the whole lot. I did not pay any rent to him.

The jury returned a verdict for the plaintiff. The defendant moved for a new trial on the grounds: (1) that the verdict is contrary to the evidence, and without evidence to support it; (2) that the verdict is decidedly and strongly against the weight of the evidence; (3) that the verdict is contrary to law and the principles of justice and equity. By amendment he added several grounds in which he complained that the verdict was contrary to certain instructions given by the court to the jury. By another amendment the defendant complained that the court erred in allowing the plaintiff to testify as follows: " I gave the Stillwell Realty Company written authority to sell that one half." This testimony was objected to on the ground that the written authority given by the plaintiff for the sale of this property was the best evidence of the authority given to the Stillwell Realty Company;

which objection was overruled. The defendant further alleged that the court erred in allowing the plaintiff to testify as follows: " I only intended to convey the northern half of lot 133 Johnston ward, and did not intend to convey the whole lot, because it was cut in half when I built on the northern half; after dividing it I built two houses there, 197, 196, and 194 is the number of the house in the lane, and 797 is the front number on Wolff street. I sold these two houses to Clark & Clark." Defendant objected to this testimony on the ground that the actual written agreement for conveyance was the best evidence of what the parties intended to convey. The court overruled this objection, and error was assigned on this ruling.

The court overruled the motion for new trial, and error was assigned on this judgment.

The defendant did not file his answer at the appearance term; and the case was marked in default. At the trial term the defendant filed his motion to open the default and for permission to file his answer. The plaintiff moved to dismiss the motion to open, on various grounds. This was overruled; to which ruling the plaintiff excepted. On January 8, 1921, Judge Meldrim, after hearing the evidence, passed an order opening the default and requiring the defendant to pay all costs to date, including the costs of the motion, and requiring him instanter to file a meritorious defense. To this ruling, and to the judgment overruling the motion to dismiss the motion to open the default, the plaintiff filed his exceptions pendente lite; and in his cross-bill of exceptions in this case he assigned error thereon.

*George W. Owens,* for Green. *Connerat & Hunter,* contra.

HINES, J. (After stating the foregoing facts.)

1. The court did not err in overruling the formal grounds of the motion for new trial, as there was evidence to support the verdict, and the same is not against the law. This leaves for our consideration only the grounds of the defendant's amendments to his motion for new trial.

2. The grounds of the defendant's first amendment to his motion for new trial complain that the verdict is contrary to four instructions given by the court to the jury. These grounds are equivalent to an objection that the verdict is contrary to law, and are embraced in that single objection; for if the charge be not law,

the verdict will be upheld, though against the illegal charge. *Hughes* v. *Hughes,* 72 *Ga.* 173; *Augusta &c. R. Co.* v. *Randall,* 79 *Ga.* 304 (10) (4 S. E. 674); *Brannan* v. *McWilliams,* 146 *Ga.* 528 (4) (91 S. E. 772); *Mitchell* v. *Mitchell,* 151 *Ga.* 466 (107 S. E. 44.)

· 3. It is urged that the plaintiff could read, that he did not read the sale agreement between him and the defendant, that if he had done so he would have discovered the alleged mistake in this instrument, that his failure to read this document and inform himself of its contents was gross negligence on his part, and that for this reason a court of equity will close its doors against him, and decline to reform this instrument so as to make it speak the true contract between the parties, although the scrivener made a mistake in preparing it, and both parties executed it under a mutual mistake. This court has held that where two contracting parties deal with each other at arm's length and on equal terms, and where there is no such confidential relation between them as to justify special confidence reposed by one in the other, a written instrument entered into between them can not be set aside upon the ground that the party seeking to be relieved was induced to enter in and sign the instrument in consequence of fraudulent representations as to its contents upon the part of the adverse party, when it appears that the party signing could read, that there was nothing to prevent him from reading the instrument, but that he did not do so, that there was no sufficient excuse for his failing to do so, but he signed after he had full opportunity to inform himself as to the terms of the instrument by reading it, but negligently omitted to read the same, when he could thus have informed himself of its contents. *Bostwick* v. *Duncan,* 60 *Ga.* 383; *Boynton* v. *McDaniel,* 97 *Ga.* 400 (23 S. E. 824); *Chicago Building &c. Co.* v. *Summerour,* 101 *Ga.* 820 (29 S. E. 291); *Jossey* v. *Ga. So. & Fla. Ry. Co.,* 109 *Ga.* 439 (34 S. E. 664); *Walton Guano Co.* v. *Copeland,* 112 *Ga.* 319 (37 S. E. 411, 52 L. R. A. 268); *Georgia Medicine Co.* v. *Hyman,* 117 *Ga.* 851 (45 S. E. 238); *Harrison* v. *Wilson Lumber Co.,* 119 *Ga.* 6 (2) (45 S. E. 730); *Stoddard Mfg. Co.* v. *Adams,* 122 *Ga.* 802 (50 S. E. 915); *Rounsaville* v. *Leonard Mfg. Co.,* 127 *Ga.* 735 (2) (56 S. E. 1030).

This doctrine has likewise been applied by this court to actions for reformation of instruments. On this subject this court has

said: "Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party (who was able to read), and fraud of the other party which consists only in making false representations as to such contents, on which the complaining party relied as true because of confidence in the party making them; no fiduciary or confidential relation existing between the parties, and no sufficient excuse appearing why the complaining party did not read the contract." *Weaver* v. *Roberson,* 134 *Ga.* 149 (67 S. E. 662). The above doctrine does not apply if the party seeking relief shows some good excuse for not reading the instrument. *Angier* v. *Brewster,* 69 *Ga.* 362; *Chapman* v. *Atlanta Guano Co.,* 91 *Ga.* 821 (18 S. E. 41); *Wood* v. *Cincinnati Safe Co.,* 96 *Ga.* 120 (22 S. E. 909); *McBride* v. *Macon Telegraph Co.,* 102 *Ga.* 422 (30 S. E. 999); *Gore* v. *Malsby,* 110 *Ga.* 893 (36 S. E. 315).

We do not think that this principle should be extended to cases in which it is sought to reform written instruments on the ground of mutual mistake of fact. It has been proclaimed and applied by this court only in cases where parties have sought to be relieved from their contracts, or have undertaken to have instruments reformed, on account of fraud perpetrated by one of the parties on the other. In *Baker* v. *Patton,* 144 *Ga.* 502 (87 S. E. 659), which was an action for reformation, and in which this doctrine was applied, this distinction was drawn; and Presiding Justice Beck said: "It is unnecessary to point out that petitioner does not rely upon a mutual mistake of fact to have the reformation of the writing which is sought."

In all cases where the form of the conveyance or instrument is, by mutual mistake, contrary to the intention of the parties in their contract, equity will interfere to make it conform thereto. Civil Code, § 4567; *Rogers* v. *Atkinson,* 1 *Ga.* 12; *Wyche* v. *Greene,* 16 *Ga.* 49; *Lucas* v. *Lucas,* 30 *Ga.* 191 (76 Am. D. 642); *Kelly* v. *Hamilton,* 135 *Ga.* 505 (69 S. E. 724); *Fambrough* v. *DeVane,* 138 *Ga.* 47 (74 S. E. 762); *Kight* v. *Gaskin,* 139 *Ga.* 379 (77 S. E. 390); *Mason* v. *Cobb,* 148 *Ga.* 469 (96 S. E. 1042). "In every case under this head of the law, the only inquiry is, does the instrument contain what the parties intended it should and understood that it did? Is it their agreement? If not, then it may be reformed by *aliunde* proof, so as to make it the evidence of what

was the true bargain between the parties. And it is wholly immaterial from what cause the defective execution of the intent of the parties originated." Wyche *v.* Greene, supra. In such cases the negligence of the party complaining will not defeat his right to reformation, if the other party has not been prejudiced thereby. The Civil Code declares: " The negligence of the complaining party, preventing relief in equity, is that want of reasonable prudence the absence of which would be a violation of legal duty. *Relief may be granted even in cases of negligence by the complainant, if it appears that the other party has not been prejudiced thereby."* § 4571. In the case at bar the defendant will not be prejudiced by the reformation of this instrument so as to make it speak the true contract between him and the plaintiff. If he gets what he bought, then he can not be hurt by reforming the instrument so as to keep him from getting what he did not buy.

It is true equity will not reform a written contract unless the mistake is shown to be a mistake of both parties. The mistake must be mutual. Civil Code, § 4579; *Quiggle v. Vining, 125 Ga.* 98 (54.S. E. 74). There is evidence from which the jury could well have inferred that the sale agreement between the plaintiff and the defendant, by a mutual mistake, did not speak the true contract between them; and that it was an afterthought of the defendant to claim the south half of the lot in question. We do not think that the verdict of the jury is contrary to the true law of the case; and we can not set it aside on the ground that it is contrary to law.

4. In the first ground of his last amendment to his motion for new trial the defendant alleges that the court erred in permitting the plaintiff to testify that he " gave the Stillwell Realty Company written authority to sell that one half." The ground of objection was that the writing given by the plaintiff to the real-estate broker for the sale of his property was the best evidence of such authority. This witness was not permitted to state the contents of this instrument. He merely stated that he had given written authority to the real-estate broker to sell his property. The plaintiff did not propose to go, and did not go, into the contents of this writing, but merely proposed to prove the fact that such writing had been given. The court did not err in permitting the plaintiff to so testify. *Sasser* v. *Sasser, 73 Ga. 275* (5) ; *Henderson* v. *Central*

*Railroad,* 73 *Ga.* 718 (2); *Central Railroad* v. *Wolff,* 74 *Ga.* 664 (2); *Kelly* v. *Kauffman Milling Co.,* 92 *Ga.* 105 (18 S. E. 363); *Fisher* v. *Jones Co.,* 93 *Ga.* 717 (21 S. E. 152); *Merchants National Bank* v. *Vandiver,* 104 *Ga.* 165 (30 S. E. 650).

5. In the second ground of this amendment it is alleged that the court erred in allowing the plaintiff to testify as follows: "I only intended to convey the northern half of lot 133 Johnston ward, and did not intend to convey the whole lot, because it was cut in half when I built on the northern half; after dividing it I built two houses there, 197, 196, and 194 is the number of the house in the lane, and 797 is the front number on Wolff street. I sold two houses to Clark & Clark." The objection urged was that what the witness intended to convey was not competent evidence; and that the best evidence of what the intention was is the actual written agreement for conveyance. This objection is without merit. Resort to parol evidence is necessary to reform an instrument. Without parol evidence there can be no reformation. A written instrument is evidence of what the parties intended to do; but when a party seeks reformation of an instrument, the instrument is not the best evidence in such controversy. The very purpose of resorting to parol evidence is to contradict the instrument. So the Code provides for resort to parol evidence to prove a mistake in a deed or any other written instrument. Civil Code, § 4572.

This disposes of the alleged errors of which the plaintiff in error complains. We do not think that the court erred in overruling the defendant's motion for new trial.

*Judgment on the main bill of exceptions affirmed; cross-bill of exceptions dismissed. All the Justices concur.*