**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roy W. WILLIAMS and Carl V. Ivey,**
**Defendants-Appellants.**

**No. 29674.**

United States Court of Appeals,
Fifth Circuit.

April 5, 1971.

Rehearing Denied May 13, 1971.

---

Kenneth E. Goolsby, Albert H. Dallas, Thomson, Ga., Ben B. Ross, Lincolnton, Ga., William C. Calhoun, Calhoun & Kernaghan, Augusta, Ga., for defendants-appellants.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Shiro Kashiwa, Asst. Atty. Gen., Raymond N. Zagone, Dennis M. O'Connell, Attys., Dept. of Justice, Washington, D. C., William T. Morton, Asst. U. S. Atty., Augusta, Ga., for plaintiff-appellee.

Before BELL, DYER and RONEY, Circuit Judges.

DYER, Circuit Judge:

In this boundary dispute, Williams and Ivey appeal from the District Court's judgment enjoining them from future trespass on lands owned by the United States and ordering them to remove all obstructions from the Government's property. Williams and Ivey argue that the District Court erred both in denying them a jury trial and in publishing clearly erroneous findings of fact and incorrect conclusions of law, upon which its judgment was based. We affirm in part, reverse in part, and remand.

This controversy has been a half century in the making. Originally the land in dispute was part of a tract consisting of approximately 350 acres located in Lincoln County, Georgia. Known as the "Weathers Place," the tract was owned by Mrs. M. J. Groves at the time of her death in 1918. Mrs. Groves devised the tract to her three children, Meynard Groves, Mabel May, and Lena May. She gave testamentary directions that the property be divided among them as equally as possible. Pursuant to her wishes, O. S. Barnett surveyed the property and drew two plats, each of which depicted part of the tract. Based on these plats, Mrs. Groves' two daughters received undivided one-half interests in a 235½ acre parcel; Meynard Groves was deeded the remaining 117½ acre parcel. Each of these transactions referred to one or the other of Barnett's survey plats. Later that year, the sisters voluntarily partitioned their parcel, Lena receiving the southern half.

In October 1949 Roy Williams, a successor in title to Meynard Groves, agreed to sell 30 acres of the Groves parcel to the United States for use in connection with the Clark's Hill Dam and Reservoir Project. This property was directly west of and adjacent to land owned by Lena May. Utilizing Barnett's plats, the Corps of Engineers surveyed the property to be purchased by the United States. According to government witness, concrete monuments were then placed at the corners of the property. Subsequently, on November 14, 1949, Williams requested an individual map of the land he was selling. In response to his letter, the Corps of Engineers stated that it did not furnish individual tract maps but sent him a tracing, taken from its grid map, of the property in question.

On December 15, 1949, Williams deeded 30 acres, "more or less," to the United States; the signed sales agreement included a detailed legal description of the property.[1] At the same time, Wil-

---

1. The legal description reads as follows:
 All that tract or parcel of land lying and being situate in Lincoln County, Georgia, bounded on the north by other lands of Roy Williams, on the east by lands of Mrs. Lena May, on the south by lands of Mrs. Mamie Hogan Hawes, on the west by lands of Charles H.

liams executed a "Declaration of Ownership" in which he stated that he owned the property in question and had been in exclusive possession for four years. Furthermore, in the deed he promised to "warrant and defend the title to the said property unto the [United States] and its assigns against the lawful claims of all persons whomsoever * * *."

On September 22, 1953, Williams and Carl Ivey purchased land east of and adjacent to the Government's property from Lena May. The sales agreement described the property only as bounded by the lands of adjoining landowners, including the United States.[2] However, the agreement referred to a plat by M. B. Cooper setting the western boundary of Mrs. May's property—the line of demarcation between her property and that of the United States—at Cliat Creek. Ostensibly based on reputation in the community as to boundaries, the Cooper plat was prepared in 1953. However, it was not recorded until 1969, after the action *sub judice* had been filed. Instead, the parties inadvertently

attached one of Barnett's 1918 plats in 1964, when they recorded their deed from Lena May.

Practically speaking, the Williams-Ivey purchase solidified the issues raised in this lawsuit, for there is an irreconcilable deviation between the mutual boundary set by the United States and that claimed by Williams and Ivey. On the one hand, the Government's survey, following Barnett's plats, located the southernmost point of this boundary at a no-longer-existing pine sprout; this is also the southeast corner of the Government's property. The locus of this sprout was fixed by following the bearings shown on the Barnett plat from the southwestern corner of the property (an existing spring) and running to a point 15.30 chains S.58 E. (mistakenly described by the District Court as N.58 W.). From the pine sprout, the Government's line runs north. Generally this boundary line follows the bed of Cliat Creek, which runs north-south. However, on Barnett's plats and the Government's survey, the line is delineated as

Hawes Estate and being more particularly decribed as follows:

Beginning at a pine sprout which is a common corner to the lands of Mrs. Lena May, Mamie Hogan Hawes and the herein described tract and having a coordinate value 1,354,178 N. 56 degrees 19 minutes W. 1110 feet to a spring which is a common corner to the lands of Mrs. Mamie Hogan Hawes, Charles H. Hawes Estate and the herein described tract; thence along the lands of Charles H. Hawes Estate N. 0 degrees 27 minutes W. 814.1 feet to a point on the property line between the lands of Charles H. Hawes Estate and lands of Roy Williams; thence along a new line through the lands of Roy Williams N. 66 degrees 30 minutes E. 1160.1 feet to a point on the property line between the lands of Roy Williams and the lands of Mrs. Lena May; thence along the lands of Mrs. Lena May S. 4 degrees 46 minutes W. 1855.0 feet to the point of beginning and containing 30.0 acres, more or less.

Bearings are Plane Bearings referring to the Transverse Mercator Coordinate System, Georgia East Zone.

2. Lena May's deed to Williams and Ivey describes her parcel as all that tract or parcel of land lying and being in the 183rd District, G. M., Lincoln County, Georgia, containing 121.821 acres more or less, and bounded as follows: On the North by lands of Roy W. Williams: On the East by lands of J. P. Wells, Sr.: On the South by lands of United States of America, and on the West by lands of Roy W. Williams and lands of Mrs. Mamie Hawes Estate. Being known as a part of the Weathers Place. Said tract of land is more particularly described according to a plat of same prepared by M. B. Cooper, Reg.-No. 122, dated __ of __ 1943, Said plat being recorded in Plat Book 2 at page 129 of the records in the office of the Clerk of Superior Court, Lincoln County, Georgia.

This being the same tract of land conveyed by quitclaim deed to party of the first part [Lena May] by W. R. Groves, et al., dated April 28, 1953, and recorded in Deed book 18 at pages 11 and 12 of the records in the office of the Clerk of Superior Court, Lincoln County, Georgia.

The quitclaim deed's description of Lena May's property is no more definite.

independent from the meandering of the branch. Neither Barnett nor the Government surveyed the creek. Indeed, as to the mutual boundary, Barnett noted on his plats: "This line was estimated." Moreover, Barnett did not bother to draw the creek accurately: when his two plats are juxtaposed, the creek does not occupy the same position in relation to the mutual north-south boundary.[2] Apparently Barnett supposed that the creek follows a reasonably straight north-south course. Actually it does not: when the creek reaches the southern part of the Groves parcel, it meanders westerly. The consequence of this veering is that the Government's measured southeast corner is several hundred feet east of the creekbed at that point. In none of the six deeds in the chain of title to the Groves parcel was the creek mentioned as a boundary. Each deed described the property as bounded on the east by lands of various adjoining owners. All the instruments referred to the Barnett plat pertaining to the Groves parcel.

On the other hand, Williams and Ivey employed Cooper to survey the property which they intended to purchase from Lena May in 1953. Allegedly Cooper could not find the Barnett plat of this property. Thus, in preparing his survey, he relied on reputation in the community—particularly the testimony of Mrs. May—as to the western boundary of her property. Indeed, during a pretrial deposition, Mrs. May acknowledged her familiarity with the property and said that "I've always heard them [immediate family members] say that the creek was the line." Corroborating her statements was evidence of wire embedded deep in several old trees along the creek; at one time this wire constituted part of a fence. Also, Williams testified that during the fifty years he had known the property, the branch had always been considered the boundary. He commented further that a man named Hogan had once farmed the area east of

the creek and a man named Jacobs had farmed the area west of the branch. Cooper's 1953 plat, showing the creek as the boundary, lends credence to Mrs. May's and Williams' assertions.

Thus it becomes apparent that the crux of this controversy is whether a natural boundary (Cliat Creek) or either of the surveyed lines now separates the property owned by the United States from that held by Williams and Ivey. After the Williams-Ivey purchase, all that remained was for one landowner to encroach on the disputed area, and for the other to discover his presence.

Soon after they acquired Lena May's property, Williams and Ivey built a fence along Cliat Creek, cleared the area, cut timber, and began farming. A government forest ranger discovered these activities in 1964. After repeated attempts to dissuade Williams and Ivey from continuing their operations had failed, the United States filed a complaint characterizing these intrusions as continuing trespasses and praying for a permanent injunction, as well as damages for timber cut and removed from the premises. In their answer Williams and Ivey sought reformation of the deed from Williams to the Government to exclude the disputed land from the legal description; they demanded a jury trial as to "each and every issue of fact." The District Court refused both requests.

After a non-jury trial, the District Judge determined that the Government's contentions regarding the location of the boundary between its property and the Williams-Ivey holdings were correct. The judge based his conclusions upon consideration of the Barnett plats, the intention of Mrs. M. J. Groves and of her heirs in division of the original tract, and the chain of title culminating in Williams' deed to the United States. The District Court entered judgment enjoining Williams and Ivey from trespassing on property described in the

---

3. Barnett depicted the stream as running west of the Meynard Groves line on one plat and immediately east of the western boundary of the May land on the other.

deed to the United States. It reserved the issue of damages for future determination.

Williams and Ivey here argue that the District Court erred in denying them the right to trial by jury. Since the Government injected the legal issue of damages into its complaint, they contend that a jury determination of all issues was mandatory. Furthermore, they assert that the court omitted consideration of important, relevant evidence and testimony in reaching its conclusion. Specifically they urge that the mutual boundary between the lands now owned by the United States and those held by Williams and Ivey was unascertainable because of ambiguities in the Barnett plats, and that the original devisees of these parcels agreed to establish Cliat Creek as the common boundary. Pointing out that the remnants of an ancient fence along the creek still exist, Williams and Ivey allege that they have merely renovated the proper boundary. Thus they ask that the District Court's judgment be reversed and the case remanded for jury determination of whether Williams' deed to the United States should be reformed to establish Cliat Creek as the dividing line.

Preliminarily it is important to note that jurisdiction of the District Court has been predicated on 28 U.S.C. A. § 1345.[4] Consequently the *Erie* rule requiring adherence to the appropriate substantive law of a particular state in diversity cases becomes inapposite. Tri-State Insurance Co. v. United States, 8 Cir. 1965, 340 F.2d 542, 544; *see* United States v. Standard Oil Co. of Cal., 1947, 332 U.S. 301, 306–310, 67 S. Ct. 1604, 91 L.Ed. 2067. Nevertheless, the Supreme Court has long recognized that, in the absence of a contravening federal statute or policy, suits by the Government to protect its proprietary interests in land are local in nature.[5] Mason v. United States, 1923, 260 U.S. 545, 558, 43 S.Ct. 200, 67 L.Ed. 396; *see* United States v. Standard Oil Co. of Cal., *supra*, 332 U.S. at 308–09, 67 S.Ct. 1604; Camfield v. United States, 1897, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260; Cotton v. United States, 1851, 52 U.S. (11 How.) 229, 231, 13 L.Ed. 675. With this in mind, we conclude that the law of Georgia, the state in which the parties' lands are located, should govern this controversy. *See* Mason v. United States, *supra*; United States v. Marin Rock & Asphalt Co., C.D.Cal.1969, 296 F.Supp. 1213, 1216. That no party has asserted the applicability of non-Georgia law buttresses our conclusion.

Nevertheless, although the substantive claim asserted in federal court arises under state law, characterization of that state-defined claim as legal or equitable for purposes of determining whether a right to jury trial exists must be made under federal law. Simler v. Conner, 1963, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691; *see* General Dynamics Corp. v. Miami Aviation Corp., 5 Cir. 1970, 421 F.2d 416, 418; Klein v. Shell Oil Co., 8 Cir. 1967, 386 F.2d 659, 662–663; Ammons v. Franklin Life Insurance Co., 5 Cir. 1965, 348 F.2d 414, 416; Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir. 1951, 191 F.2d 705, 712–713, 718, cert. denied, 1952, 342 U.S. 920, 72 S.Ct. 367, 96 L. Ed. 687. In this light Williams' and Ivey's argument with respect to their right to a jury trial is clearly meritorious. In its complaint the Government styled this action as one involving trespass on lands owned by the United States; the Government demanded both legal and equitable relief. In their an-

---

4. Section 1345 provides:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

5. That the choice of law depends, at least in part, on the subject matter of the litigation is clear. *See, e. g.*, United States v. National Bank of Commerce, 5 Cir. 1971, 438 F.2d 809, 813.

swer Williams and Ivey challenged the Government's lawful title to the disputed property, which they occupied; alternatively they sought reformation of Williams' deed to the United States. Historically,

> [w]here A claimed that B's structure encroached on A's land but B also claimed title to the land under the structure, equity would not order the structure removed until the title dispute was settled at law.

> \* \* \* [E]quity would refuse to try the legal issue; and the legal issue would always be tried first. If the trial was won by A, he still would often need a second suit in equity to get complete relief. Thus there would be two trials, one to a jury, and one to a court alone on those issues which pertained to the propriety of equitable relief. Again, neither party had any choice in the matter, and the courts had no discretion.

James, "Right to a Jury Trial in Civil Actions," 72 Yale L.J. 655, 671 (1963). If the United States is substituted for "A" and Williams and Ivey are substituted for "B", Professor James' hypothetical becomes strikingly similar to the instant case. While the Federal Rules of Civil Procedure have obviated the need for successive actions to achieve legal and equitable relief, they have not abrogated the common law right to jury consideration of legal issues, such as title to land in trespass and ejectment actions, after timely demand. U.S.Const. amend. VII; Fed.R.Civ.P. 38; *see* Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 5 Cir. 1961, 294 F.2d 486, 488–491. *Compare* Humble Oil & Refining Co. v. Sun Oil Co., *supra*, 191 F.2d at 718, *with* Zunamon v. Brown, 8 Cir. 1969, 418 F.2d 883, 888–889. When legal and equitable issues are merged in a single case, the trial court's discretion "is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." Beacon Theatres, Inc. v. Westover, 1959, 359 U.S. 500, 510, 79 S.Ct. 948, 956, 3 L.Ed.2d 988; *accord,*

Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., *supra*, 294 F.2d at 490.

That the District Judge in the case *sub judice* reserved the issue of damages for later determination did not change the nature of this action, thereby making a jury trial unnecessary. Antecedent to his injunctive judgment, the judge ascertained the title-holder of the disputed property. Thus despite the bifurcation his decision was essentially legal rather than equitable and reached questions of fact normally answered by a jury.

██ However, this Court does not demand jury consideration of an issue which is determinable by directed verdict. The question whether evidence is sufficient for submission to a jury is procedural. Therefore, we apply a federal, rather than a state, standard. Hommel v. Jackson-Atlantic, Inc., 5 Cir. 1971, 438 F.2d 307, 308; Falcon v. Auto Buses Internacionales, 5 Cir. 1969, 418 F.2d 673, 676. According to the test articulated by this Court in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374–375, "[t]he motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question."

Having considered all the evidence and testimony available to the District Judge, we conclude that Williams has not passed the *Boeing* test. Hence, although the District Judge should have recognized Williams' right to a jury trial, he should also have directed a verdict in favor of the United States. On this ground we affirm his judgment, since no issue remained for jury determination. "There is no constitutional right to have twelve men sit idle and functionless in a jury-box." United States v. 243.22 Acres of Land, 2 Cir. 1942, 129 F.2d 678, 684, cert. denied, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558.

However, for reasons discussed *infra,* we have determined that the United States has not satisfied the *Boeing* criteria entitling it to a directed verdict as to part of the disputed premises in its trespass action against Ivey. Moreover, we find that Ivey retains a cotenancy interest in this area. Consequently we reverse the District Court's judgment and direct that a judgment for Ivey be entered, insofar as trespass on this section of the territory in controversy is concerned. Concerning the remainder, the District Judge should have directed a verdict against Ivey in favor of the United States.

■ As to Williams the basis for our conclusion should be obvious. "The maker of a deed cannot subsequently claim adversely to his deed under a title acquired since the making thereof. He is estopped from denying his right to sell and convey." Ga.Code Ann. § 29–111; *accord,* Perkins v. Rhodes, 1941, 192 Ga. 331, 15 S.E.2d 426, 427–428; *see* Dillard v. Brannan, 1961, 217 Ga. 179, 121 S.E.2d 768, 771; Ga.Code Ann. § 38–114. Williams' attempt to circumvent this statutory prohibition by seeking reformation must fail. To maintain an action for reformation of his deed to the Government, Williams must show either that there was a mutual mistake of the parties in the execution of the deed or that there was fraud on the part of one party (the United States) and a mistake on the part of the other. Lawton v. Byck, 1962. 217 Ga. 676, 124 S.E. 2d 369, 373–374; Sheldon v. Hargrose, 1957, 213 Ga. 672, 100 S.E.2d 898, 900; Hicks v. Smith, 1949, 205 Ga. 614, 54 S. E.2d 407, 410; Gibson v. Alford, 1926, 161 Ga. 672, 682, 132 S.E. 442; Green v. Johnson, 1922, 153 Ga. 738, 113 S.E. 402. Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party, who is able to read but negligently fails to do so, unless there is a mutual mistake of fact. *See* Sheldon v. Hargrose, *supra*; Green v. Johnson, *supra.* Here the District Court found, and we agree, that there

was neither fraud on the part of the purchaser nor a mutual mistake as to the contents of the deed. It is unfortunate, as the District Judge noted, that the Engineers did not inform Williams of the Barnett survey's inaccuracy in depicting the course of Cliat Creek near the southern edge of the Groves parcel and apprise him of the fact that the eastern boundary was several hundred feet east of the branch. However, Williams received a sketch of the 30 acres and could easily have observed that the creek was not shown as the boundary. With slight trouble he could have ascertained the true eastern boundary of the property he was selling to the United States. That corner monuments had already been placed by the Government would have facilitated his task. Because of his negligence, Williams evidently labored under a mistake of fact when he signed the deed. This is not true with respect to the Government. It was buying 30 acres which it had surveyed and described in reliance on the Barnett plats. As far as the Corps of Engineers was concerned, the Barnett survey was substantially correct. Thus there could be no mutual mistake. It follows that Williams is not entitled to reformation.

Ivey, however, does not have Williams' handicaps for he was not a party to the 1949 transaction between Williams and the Government. If the western boundary of the land Lena May sold to Williams and Ivey in 1953 is not that claimed by the Government, Ivey could become cotenant with the United States, in regard to any disputed acreage. Certainly he is not estopped from claiming adversely to the Government's deed.

■ Ivey's contention that Cliat Creek constitutes the western boundary of the Lena May property is untenable. Both Barnett's and the Government's surveys contradict this assertion. It is supported only by the Cooper plat, which is allegedly based on reputation in the community. However, Cooper testified that his knowledge as to the western boundary of Lena May's property—the line of demarcation between her land

and that of the United States—had been derived primarily from Mrs. May. Her statements, coupled with those of the defendants, comprised the surveyor's "reputation in the community." Cooper admitted that he did not consult the Government as to the mutual boundary. Nor did he use the Barnett plats in conducting his survey. Indisputably, these plats were available since they had been recorded as early as 1919. Moreover, they were indispensable elements in the chains of title pertaining to the Weathers Place. *See* Hardy v. Brannen, 1942, 194 Ga. 252, 21 S.E.2d 417, 419; Warsaw Turpentine Co. v. Fort Barrington Club, 1938, 185 Ga. 540, 543, 195 S.E. 755; Patrick v. Sheppard, 1936, 182 Ga. 788, 187 S.E. 379. In sum, we do not perceive, and Ivey has offered no rational explanation, why Cooper's plat should prevail over Barnett's. Accordingly, we defer to the latter.

 When a natural boundary is specified in a deed or plat, the line will there terminate, regardless of how wide of the course or short of the distance called for. Barrett v. Dodd, 1950, 206 Ga. 840, 59 S.E.2d 395, 396; Stewart v. Latimer, 1944, 197 Ga. 735, 30 S.E.2d 633, 637; Warsaw Turpentine Co. v. Fort Barrington Club, *supra*; Thompson v. Hill, 1912, 137 Ga. 308, 73 S.E. 640; Riley v. Griffin, 1854, 16 Ga. 141, 147. Of course, when descriptions in deeds and plats conflict, the former control. Johnson v. Willingham, 1956, 212 Ga. 310, 92 S.E.2d 1, 3; *cf.* Duke v. Wilder, 1955, 212 Ga. 26; 90 S.E.2d 12, 13–14.

In this case no one has satisfactorily explained the discrepancy between Barnett's plats and the Government's survey, the results of which are incorporated in its legal description. When Barnett surveyed the Maynard Groves parcel, he noted the length of its southern boundary to be 15.30 chains (1009.8 feet). The Corps of Engineers, however, measured this same boundary as 1110 feet. Relying on Barnett's other measurements and corner locations, the Engineers apparently concluded that the surveyor had been mistaken in fixing the location of the fourth corner, the now nonexistent pine sprout. To check the accuracy of their own measurements, the Engineers surveyed from their theoretical location of the pine sprout to the purported southeast corner of Lena May's property. They found the distance between these two points to be 23.-77 chains, a measurement dovetailing with Barnett's. Thus they established the location of the pine sprout at a point 23.77 chains from the southeast corner of Lena May's parcel.

This reasoning begs questions: why is the Engineers' survey more correct or more authoritative than Barnett's? Why should the 100 feet be added to the Government's parcel rather than Lena May's? Neither the Government nor the District Court has provided a satisfactory answer. Certainly resolution of this issue cannot affect Williams' interest, for he is estopped by deed from contesting the Government's claim to title, as manifested in the deed's legal description of the property. However, Ivey does not stand in Williams' shoes. If Lena May's deed to Williams and Ivey has provided the United States with after-acquired title, Ivey can still claim a tenancy in common with the United States as to the disputed territory: the base of which is approximately 100 feet along the southern boundary of the Weathers Place and the sides of which are formed by the Government's delineation of the boundary between its property and Mrs. May's and Barnett's line between the two parcels.

 Initially, we cannot accept the argument that Mrs. May and the Government's predecessors in interest, as coterminous proprietors, long ago established Cliat Creek as their common boundary. In this regard, Ivey's assertions seem merely an *ex post facto* justification for Cooper's plat. It is true that an unascertained or disputed boundary between adjoining landowners may be established by oral agreement— if that agreement is accompanied by actual possession to the agreed line or is otherwise executed, or by acquiescence

for seven years by acts or declarations of both property holders. *See* Greenway v. Griffith, 1969, 225 Ga. 632, 170 S.E. 2d 423, 426; Carter v. Wyatt, 1966, 113 Ga.App. 235, 148 S.E.2d 74, 79; Stone v. Jernigan, 1958, 214 Ga. 249, 104 S.E.2d 101, 102; Brunswick Pulp & Paper Co. v. Wilson, 1955, 211 Ga. 862, 89 S.E.2d 476, 477; Bradley v. Shelton, 1940, 189 Ga. 696, 7 S.E.2d 261, 263; Ga.Code Ann. § 85–1602. Nevertheless, the Georgia supreme court has emphasized:

> Without exception the cases hold that, before the dividing line can be established by express agreement of the adjoining owners, it must be in dispute, uncertain, or unascertained. * * * If it is required when there is an express agreement, then it is even more necessary where an implied agreement is relied upon.

> But, if by an insistence upon a strict limitation to the precise language of the Code [§ 85–1602], it is urged that no dispute or uncertainty as to the line is prerequisite to the establishment by acquiescence, the complete and decisive answer is that the Code refers to "establishing," and not "re-establishing" the dividing line. If the line be certain and ascertained, it is established already, and the rule for establishing it by acquiescence is inapplicable. In such a case with the line established and ascertained, it would be trifling with the law and with honesty between men to write a rule of law whereby the lands of one would be given to the other in open defiance of the plainly marked and established dividing line between them. * * * The law will not thus aid in creating doubts as to men's rights where they are plainly and unmistakably fixed, and then destroy those rights by means of the doubts thus deliberately created.

Warwick v. Ocean Pond Fishing Club, 1950, 206 Ga. 680, 58 S.E.2d 383, 386–387; *see* McNeal v. Carter, 1940, 191 Ga. 441, 12 S.E.2d 332, 333–334; Miller v. McGlaun, 1879, 63 Ga. 435, 436.

Necessarily implied in the supreme court's statement is the caveat that coterminous proprietors must know or reasonably believe a boundary is disputed or unascertained before they can orally agree to or acquiesce in a new line. Otherwise, their agreement, whether express or implied, runs afoul of the statute of frauds, Ga.Code Ann. § 20–401 ¶ 4. *See* McNeal v. Carter, *supra,* 12 S.E.2d at 334. *Compare* Miller v. McGlaun, *supra,* 63 Ga. at 436, *with* Farr v. Woolfolk, 1903, 118 Ga. 277, 279, 45 S.E. 230. An agreement which utterly disregards a boundary defined in a prior deed, and which contravenes that deed, is ineffectual against a subsequent purchaser without notice. McNeal v. Carter, *supra.*

The Georgia supreme court's decision in Hethcock v. Padgett, 1961, 217 Ga. 328, 122 S.E.2d 213, does not contradict these propositions. In *Hethcock* both parties acquired title to their respective adjacent tracts from a common grantor. The evidence disclosed that the common grantor and Padgett, defendant in this ejectment action, orally agreed upon the location of the line dividing their properties; then Padgett erected poultry houses, fences and hog pastures inside the agreed line. Later Hethcock acquired title to the property held by the common grantor at the time of the agreement with Padgett. Six years after he received the property, Hethcock surveyed the boundary between his land and Padgett's. The survey revealed that the land lot line separating the two tracts was several feet distant from, and parallel to, the line established by the common grantor and Padgett. It was further apparent that Padgett's poultry houses and fences were several feet inside Hethcock's property line. The jury verdict for Padgett was made the judgment of the trial court and upheld by the supreme court. In its opinion the court stated:

> While it is true that the boundary, which was a land lot line, was ascertainable, yet, as between the parties to the agreement, it was, prior to and at

the time of the agreement, unascertained.

\* \* \* \* \* \*

Thus the agreement between the defendant and Mrs. Bramblett [the common grantor] effectively fixed the boundary line and was binding upon Mrs. Bramblett and her successors in title, in which category the plaintiff falls. \* \* \*

\* \* \* \* \* \*

Furthermore, there is abundant evidence that at the time the plaintiff purchased the property \* \* \* there were facts sufficient to put him on notice of the boundary line which had been agreed upon between his grantor and the defendant, e. g., the poultry houses, fences, etc.

Id. at 214–215. Relying on Warwick v. Ocean Pond Fishing Club, supra, the court concluded that, although the line demanded by Hethcock was definite insofar as the words of the deeds were concerned, it had never been located and marked on the land itself. Since the line was "ascertainable" but "unascertained," Hethcock and the common grantor could legally establish its location by oral agreement. It is clear that the Hethcock court also relied on the fact that Padgett had visibly improved the disputed property prior to plaintiff's purchase of the adjacent land.

▪ In contrast, Ivey's assertion that Cliat Creek has become the mutual boundary between the property held by Williams and him and that owned by the United States lacks tangible support. First, the alleged agreement between predecessors in title to Williams and Ivey and the Government was not evidentially related to an unascertained or disputed boundary. Before the Weathers Place was partitioned among Mrs. Groves' children, Barnett surveyed the entire tract and located boundary lines. His plats furnish a guide for the relocation of these same lines. Thus, ostensibly the lines were established, both in the plats and on the ground. Ivey does not contend that at the time of the alleged agreement the coterminous landowners had reason to doubt the accuracy of Barnett's survey. Nor does he argue that the parties to this agreement had unsuccessfully tried to relocate Barnett's lines on the earth. Consequently Ivey has failed to show that, as to the coterminous landowners, the common boundary was unascertained, uncertain, or disputed. The Corps of Engineers' discovery of a possible error in the Barnett survey many years later cannot bootstrap Ivey's assertion that Cliat Creek became an agreed boundary.

▪ Second, unlike the situation in Hethcock, Ivey offers no reasonable justification for the contention that the United States had notice of the agreed boundary at Cliat Creek. It is undisputed that strands of wire imbedded in several old trees, the remnants of a fence, were all that remained of the alleged boundary when the Government purchased its property from Williams. This does not constitute possession which would give notice of the purported agreement to a bona fide purchaser. See McNeal v. Carter, supra 12 S.E.2d at 333; cf. Dixon v. Dixon, 1958, 97 Ga.App. 54, 102 S.E.2d 74, 77. Moreover, Ga.Code Ann. § 85–1602 becomes operative only if the boundary line between coterminous owners who acquired their titles from a common grantor is indefinite and unascertainable. See Horn v. Preston, 1961, 217 Ga. 165, 121 S.E.2d 775, 777; Kerce v. Bell, 1951, 208 Ga. 131, 65 S.E.2d 592, 595. Having established a boundary line by consent, adjacent landowners must hold up to it by virtue of their title deeds not by virtue of a parol transfer of title. See Shahan v. Watkins, 1942, 194 Ga. 164, 21 S.E.2d 58, 60, 61. If the line is definite and ascertainable, any agreement as to a new line must pass title. As we have intimated above, "titles to land can not be created by mere verbal declarations of this character without overturning the statute of frauds." Id. at 60. In this respect, the oral agreements upheld in Hethcock and Warwick may contravene the established rule in Georgia. In this

case, however, we need not reach that issue. Neither Williams nor Ivey has challenged the assertion that, during his survey, Barnett actually located boundaries and corners on the land. Thus, in view of the Barnett plats, the evidence does not disclose that Lena May held color of title to property bordering Cliat Creek at the time of the agreement here alleged. Any agreement, then, would not have fixed the line between adjoining landowners but would have given title to land by parol. This the Georgia courts will not approve. Shahan v. Watkins, *supra* at 61. In essence, good fences make good neighbors but not necessarily good law.

Certainly the Government, too, remains subject to the legal principles applicable to Ivey. Since the United States must bear responsibility for the discrepancy between its survey and Barnett's, we conclude that the Government did not acquire title to the disputed territory until Williams and Ivey purchased their property from Lena May in 1953.[6] In effect, when Williams and Ivey bought Lena May's land, Williams

conveyed to the United States the remainder of the property described in its deed. Williams, Ivey's cotenant, conveyed good color of title to the United States as against any claim Ivey might make regarding his right to exclusive possession of the premises. *See* Davis v. Harnesberger, 1955, 211 Ga. 625, 87 S. E.2d 841, 843. Nevertheless, Williams' conveyance did not deprive Ivey of his cotenancy interest in these premises. Nor has Ivey's continued occupation of this land legally ousted the Government. Since the United States did not learn of Ivey's use of this property until 1964 and sued to protect its interest within seven years of that date, Ivey cannot claim exclusive title by adverse possession. Ga.Code Ann. §§ 85–407, 85–1005. Certainly Williams can claim no title by adverse possession because he no longer benefits from color of title and has not satisfied the applicable statute. *See* Ga.Code Ann. § 85–406.

In conclusion, we hold that, despite the apparent discrepancy between Barnett's and the Government's surveys, Williams could have no interest in the

---

6. To this point we have assumed that the two Barnett plats are conjunctive—*i. e.*, the eastern boundary of the Groves parcel (now held by the United States) and the western boundary of the May property (purchased by Williams and Ivey) are in fact the same line as delineated in separate plats. Because this line is definite and ascertainable, and has been ascertained, the parties *sub judice* must respect it in propounding their respective title claims.

One other hypothesis—unmentioned either by the Government or by Williams and Ivey—merits consideration. It is possible that the two Barnett plats are not conjunctive—*i. e.*, the eastern boundary of the Groves parcel and the western boundary of the May property are not in fact the same line. Instead, according to this theory, Barnett left a 100 foot gap between his two plats: the eastern boundary of the Groves parcel and the western boundary of the May property, identical with regard to course and estimated distance, would be parallel, but approximately 100 feet apart. If such an hypothesis were accepted, the conclusion might be that neither the Government nor Williams and Ivey may claim a titular interest in

the area between the two lines by virtue of the plats, since none of Mrs. M. J. Groves' children had exclusive title to this part of the Weathers Place. Rather, Mrs. Groves' children, or their heirs, would hold cotenancy interests in the area between the parallel lines. Both the United States and Williams and Ivey would be limited initially to claiming the undivided cotenancy interest held by Lena May; Mrs. Groves' other heirs would remain unaffected by this dispute.

Fortunately, assuming *arguendo* that the hypothesis with regard to the gap between Barnett's plats is true, it has become irrelevant. Before Lena May sold her property to Williams and Ivey, she acquired a quitclaim deed from Mabel May and the heirs of Meynard Groves. They expressly described the property quitclaimed as bounded, in part, by the lands of the United States. This deed is similar, in legal description, to that delivered to Williams and Ivey. *See* note 2 *supra*. Thus, whatever Lena May's interests may have been prior to receipt of the quitclaim deed, it is clear that she had exclusive titular rights to the eastern boundary of the Groves tract afterward.

disputed premises. Since Williams was estopped by deed from contesting the Government's right to the property, the District Court properly entered judgment against Williams in this trespass action. Ivey, however, does not stand in Williams' shoes. While the Cooper plat did not suffice to extend his title to Cliat Creek, his interest in the area manifested by the dichotomy between Barnett's and the Government's surveys should be protected. Ivey and the United States are now cotenants with respect to this land. The District Court properly entered judgment against Ivey insofar as the United States claims encroachment on the area delineated by Barnett's survey of the Groves parcel. Nevertheless, we must reverse the court's judgment to the extent that it recognizes the Government's exclusive titular interest in the area between Barnett's depiction of the Groves boundary and the Corps of Engineers' delineation of the Government's claimed line.

Affirmed in part; reversed in part and remanded.